Nos. 2--07--0717 & 2--07--1272 cons.      Filed:  8-14-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JUDY ANDERSON, Deceased, by Leonard Anderson, Special Administrator, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee and Cross-Appellant, | ) ) ) | |
| v. | ) ) | No. 04--L--541 |
| RUSH-COPLEY MEDICAL CENTER, INC., | ) ) ) | Honorable |
| Defendant-Appellant and Cross-Appellee. | ) ) | F. Keith Brown, Judge, Presiding. |

| | | |
|---|---|---|
| JUDY ANDERSON, Deceased, by Leonard Anderson, Special Administrator, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | No. 04--L--541 |
| RUSH-COPLEY MEDICAL CENTER, INC., | ) ) ) | Honorable F. Keith Brown, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE GROMETER delivered the opinion of the court:

On February 13, 2002, Judy Anderson died in the emergency room at Rush-Copley Medical

Center.  Leonard Anderson (plaintiff), decedent's husband and the administrator of her estate,

commenced a wrongful death and survival action against Rush-Copley Medical Center, Inc. (Rush-

Copley or defendant).  During discovery, defendant refused to tender to plaintiff certain documents

on the basis that they are privileged under sections 8--2101 through 8--2105 of the Code of Civil Procedure (Medical Studies Act or the Act) (735 ILCS 5/8--2101 et seq. (West 2004)). As a result, defendant was held in contempt. The issues presented in this consolidated, interlocutory appeal concern the scope of the privilege provided by the Medical Studies Act.

## I. BACKGROUND

On February 13, 2002, Judy Anderson presented to the emergency room at Rush-Copley with complaints of shortness of breath, wheezing, and fever. Later that day, Judy, then 49 years old, unexpectedly died. The medical examiner listed the cause of death as bronchopneumonia. Plaintiff commenced this action on April 29, 2003. In his first-amended complaint, plaintiff alleged that defendant committed various careless and negligent acts and/or omissions in diagnosing and treating decedent's condition.

During discovery, plaintiff propounded a set of interrogatories. One of the interrogatories asked defendant to state whether a hearing dealing with mortality or morbidity was held regarding decedent's care and treatment. Defendant responded to this interrogatory in the affirmative. Another interrogatory asked defendant to identify any statements, information, and/or documents related to the aforementioned hearing. Defendant refused to answer, claiming that such information is privileged under the Act. Plaintiff then requested a privilege log itemizing the documents related to the mortality and morbidity hearing. Defendant responded by informing plaintiff that decedent's medical care was the subject of a peer review by the Rush-Copley Sentinel Event[1] Analysis

---

[1] The Joint Commission on Accreditation of Healthcare Organizations (JCAHO) defines a "sentinel event" as "an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof." Joint Commission on Accreditation of Healthcare Organizations,

Committee (Committee) and reiterated its opinion that the documents generated by said Committee are privileged pursuant to the Act.

On August 16, 2005, plaintiff filed a motion to compel production of the documents related to the Committee's review, arguing that defendant failed to meet its burden of proving that any of the documents withheld are privileged under the Act. In response, defendant argued that it had met its burden of establishing the privileged nature of the documents in question. Attached to and in support of defendant's response was the affidavit of Sharon Rich, a registered nurse and the risk manager at Rush-Copley between 1997 and 2002, including when the medical care in question was administered to decedent and when said care was reviewed by the Committee. In the affidavit, Rich stated that the Committee met on February 22, 2002, February 28, 2002, March 26, 2002, and June 15, 2002. Rich also provided a description of the 33 documents withheld, which she averred "were generated exclusively for or by the Sentinel Event Analysis Committee for use only of the Committee in conducting its quality review of the medical care rendered Judith Anderson." At issue in this case are documents 6, 7, 8, 9, 10, and 13 (collectively, the medical journal articles) and documents 29 and 33 (collectively, the Action Plan).[2] Rich stated that these documents were stored in a three-ring notebook and were accessible only to members of the Committee. On December 15, 2005, the trial court held a hearing on plaintiff's motion to compel, during which it conducted an in camera review of the documents in question. At the conclusion of the hearing, the court granted a motion by plaintiff to depose Rich, and her deposition was taken on March 15, 2006.

---

http://www.jointcommission.org/SentinelEvents/se_glossary.htm (last visited Aug. 6, 2008). (This definition was adopted by Rush-Copley.

[2] Documents 29 and 33 are actually copies of the same Action Plan.

At a hearing on September 12, 2006, the court heard arguments from both parties and took the matter under advisement. On October 24, 2006, the trial court entered an order denying plaintiff's motion to compel, on the basis that the documents are "protected by the Medical Studies Act." On December 7, 2006, plaintiff filed a motion for clarification and/or reconsideration of the October 24, 2006, order. In the motion, plaintiff argued, inter alia, that it is unclear from the court's order whether it ruled that each and every one of the 33 items withheld by defendant was entitled to protection under the Act. Following a hearing, the court announced that it would grant plaintiff's motion for clarification. On January 3, 2007, the court entered a revised order. Relevant here, the court determined that the medical journal articles were not generated solely for the purpose of the Committee and therefore those documents are discoverable. In addition, the court "assum[ed]" that the Action Plan, which consists of various "risk reduction strategies," was the "final result of a medical peer review committee" and therefore is not privileged under the Act.

On January 26, 2007, defendant filed a motion to reconsider portions of the order entered January 3, 2007, including the court's rulings regarding the medical journal articles and the Action Plan. Attached to the motion was a supplemental affidavit from Rich, in which she stated that: (1) the Action Plan is a summary of all issues considered by the Committee, along with suggestions for "risk reduction strategies"; (2) the Action Plan contains discussion, recommendations, and conclusions of the Committee; (3) the Committee does not actually make any changes in policy or practice but only provides suggestions; (4) it is up to others, including the medical staff, to decide if changes in policy or practice will be made; and (5) not all of the Committee's recommendations are implemented. On February 22, 2007, a hearing was held on defendant's motion. The court did not rule on the motion at that time. However, at the conclusion of that hearing, the court ordered

defendant to disclose and produce any hospital policy changed as a result of the Action Plan. In response, defendant disclosed that, although no hospital policies were changed as a result of the Action Plan, a new policy was enacted.

On March 27, 2007, the trial court entered a third order regarding the discoverability of the documents in question. The court concluded that the medical journal articles are not privileged under the Act, because the Act protects only "investigative and deliberative materials generated by a hospital committee in formulating its recommendations." The court recognized that Rich testified in her discovery deposition that members of the Committee were assigned to conduct research concerning issues involving decedent's medical care and that this research resulted in locating and using medical journal articles related specifically to decedent's medical care. Nevertheless, the court noted that the medical journal articles are available to the general public and were not produced as a result of the Committee's internal investigation or study. The court emphasized that a different result would have ensued if "the medical journal articles were referenced or attached to a document which was authored by a committee member who was doing research on behalf of the committee." In such an instance, the document would constitute a "document generated for the purpose of peer review." Here, however, the articles were not attached to or referenced by any other document.

With respect to the Action Plan, the court, citing to Ardisana v. Northwest Community Hospital, Inc., 342 Ill. App. 3d 741, 747 (2003), stated that the "results" of a peer-review committee are not privileged. In this case, the court found that the Action Plan "contained recommendations which led to the revisions of procedures for medical staff at the hospital" as well as "recommendations [that were] not necessarily implemented." The court determined that the former recommendations are not privileged, because they constituted "ultimate decisions and action taken

which were a direct result of the plan and acted upon by the hospital without in [sic] any other formal process of implementation." The latter recommendations, however, remain privileged since they were not implemented. Thus, the court redacted those portions of the Action Plan that it deemed privileged. The court then provided defense counsel with a redacted copy of the Action Plan for review before it was disseminated to plaintiff.

At a hearing with respect to the status of the redacted documents, defendant asked the court for a continuance to obtain an affidavit from its director of legal affairs, Stacey Ries, in order to file a response to the redactions. The court granted the continuance over plaintiff's objection. On June 1, 2007, defendant filed its "Position on and Objection to the Court's Redactions of the Action Plan." In this filing, defendant, relying on Ardisana, argued that "the entirety of the Action Plan is privileged pursuant to the Medical Studies Act, regardless of whether changes it recommended were ever implemented." Defendant added that, although Ardisana held that the "results" of a peer-review committee are not privileged, such a committee's recommendations and suggestions resulting in changes are privileged. Attached to defendant's filing was an affidavit in which Ries stated that only one policy and procedure change was made as a result of the Committee's review of the care provided decedent. Plaintiff moved to strike the affidavit, on the basis that its contents are conclusory and based on hearsay. Plaintiff also responded to defendant's motion, arguing that the discoverability of a peer-review committee's final report does not depend on whether its recommendations were ever implemented.

At a hearing held on June 28, 2007, the trial court reviewed each of the numbered "risk reduction strategies" listed in the Action Plan, in conjunction with the Ries affidavit and the parties' arguments. At the conclusion of the hearing, the court prepared a table listing which of the "risk

reduction strategies" in the Action Plan are privileged and thus not discoverable and which of the recommendations in the Action Plan are not privileged and thus discoverable. Defendant refused to produce the documents that the court found discoverable. Thereafter, the court found defendant guilty of civil contempt and imposed a fine of $100, the payment of which was stayed pending appeal. In addition, the court denied plaintiff's motion to strike the Ries affidavit, but it allowed plaintiff to depose Ries with respect to "those areas of her affidavit in which this court ruled in favor of the Defendant over the objection of Plaintiff's counsel." On July 17, 2007, defendant filed a notice of appeal from the order of June 28, 2007, and all related orders. On July 27, 2007, plaintiff filed a notice of cross-appeal. These appeals were docketed in this court as case No. 2--07--0717. The 33 documents identified by Rich were filed under seal in this court.

Meanwhile, on July 11, 2007, plaintiff filed a "Motion to Certify Questions Pursuant to Supreme Court Rule 308 [(155 Ill. 2d R. 308)]." On November 26, 2007, the trial court entered an agreed order certifying the following three questions:

> "1. Is the applicability of the Medical Studies Act privilege to a peer review committee's final report dependent upon 'implementation' of that report by later, non peer review committees?
>
> 2. Is the discoverability of a peer review committee's final report dependent on later use of the report by other, non peer review departments?
>
> 3. If a later, non peer review committee considers whether to take action as a result of a final report, does the Medical Studies Act protect disclosure of the final report they used or any other materials that they considered?"

On December 10, 2007, plaintiff filed an application for leave to appeal pursuant to Rule 308. This court allowed the application on January 16, 2008, and docketed the appeal under case No. 2--07--1272. Thereafter, we granted plaintiff's motion to consolidate case No. 2--07--0717 with case No. 2--07--1272.

## II. ANALYSIS

### A. Case No. 2--07--0717

In case No. 2--07--0717, defendant argues that the trial court erred in holding that the medical journal articles and the Action Plan are not privileged under the Medical Studies Act. In his cross-appeal, plaintiff asserts that the trial court erred in holding that only the "implemented recommendations" of the Action Plan are discoverable. We begin our analysis with a review of the Act itself.

Section 8--2101 of the Act provides in pertinent part:

"All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or

granting, limiting or revoking staff privileges or agreements for services." 735 ILCS 5/8--2101 (West 2004).

Section 8--2102 of the Act provides that such privileged material "shall not be admissible as evidence, nor discoverable in any action of any kind in any court." 735 ILCS 5/8--2102 (West 2004). The purpose of the Act is to "encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." Niven v. Siqueira, 109 Ill. 2d 357, 366 (1985); see also Jenkins v. Wu, 102 Ill. 2d 468, 479-80 (1984). The Act is premised on the belief that, absent the privilege, physicians might be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues. Roach v. Springfield Clinic, 157 Ill. 2d 29, 40 (1993).

However, the Act was never intended to shield hospitals from potential liability (Roach, 157 Ill. 2d at 42), and " 'not every piece of information a hospital staff acquires is nondiscoverable, even if it is acquired by a peer-review committee' " (Frigo v. Silver Cross Hospital & Medical Center, 377 Ill. App. 3d 43, 65 (2007), quoting Giangiulio v. Ingalls Memorial Hospital, 365 Ill. App. 3d 823, 835 (2006)). The Act protects "documents which arise from the workings of a peer-review committee [citation] and which are an integral part, but not the result, of the peer-review process." Toth v. Jensen, 272 Ill. App. 3d 382, 385 (1995). Thus, information generated prior to the commencement of the peer-review process but later disclosed to a peer-review committee is not privileged under the Act. Grandi v. Shah, 261 Ill. App. 3d 551, 556 (1994). Similarly, any information generated after the peer-review process ends is discoverable. Grandi, 261 Ill. App. 3d at 556. Stated differently, the Act "protects against disclosure of the mechanisms of the peer-review process, including information gathering and deliberations leading to the ultimate decision rendered

by a peer-review committee, but does not protect against the discovery of information generated before the peer-review process begins or information generated after the peer-review process ends." Pietro v. Marriott Senior Living Services, Inc., 348 Ill. App. 3d 541, 549 (2004).

The burden of establishing a privilege under the Act is on the party seeking to invoke it. Ardisana, 342 Ill. App. 3d at 746. This burden may be met by submitting the materials alleged to be privileged for an in camera inspection or by submitting affidavits setting forth facts sufficient to establish the applicability of the privilege to the particular documents being withheld. Ekstrom v. Temple, 197 Ill. App. 3d 120, 127 (1990). Whether a discovery privilege applies is a matter of law, subject to de novo review. Webb v. Mt. Sinai Hospital & Medical Center of Chicago, Inc., 347 Ill. App. 3d 817, 825 (2004). However, whether specific materials are part of an internal quality control or a medical study is a factual determination, which will not be reversed on review unless it is against the manifest weight of the evidence. Frigo, 377 Ill. App. 3d at 64; Berry v. West Suburban Hospital Medical Center, 338 Ill. App. 3d 49, 54 (2003).

### 1. Medical Journal Articles

Defendant argues that the trial court erred in finding that the medical journal articles were not protected from disclosure under the Act. As set forth above, the privilege in the Act applies to "[a]ll information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a healthcare practioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs *** used in the course of internal quality control." (Emphasis added.) 735 ILCS 5/8--2101 (West 2004). This provision has been interpreted as protecting documents "initiated, created, prepared, or generated by a peer-review committee." Chicago Trust Co. v. Cook County Hospital, 298 Ill. App. 3d 396, 406

(1998). In this case, defendant concedes that the medical journal articles were not written specifically by or for the Committee or for its exclusive use. Nevertheless, defendant argues that the medical journal articles are privileged under the Act because they were located at the Committee's request, were used as a resource in conducting its review, and focused upon a particular issue arising from the care given to decedent.

At the outset, we note that the trial court expressed reservations about holding that the medical journal articles are not privileged, reasoning that producing the articles would reveal the Committee's "thought process." Nevertheless, the court ultimately concluded that the medical journal articles are discoverable because they were not initiated, created, prepared, or generated by the Committee. In this regard, the court emphasized that the medical journal articles are available to the general public, they were not produced as a result of "internal investigation or study of the [Committee]," and they were not attached to or referenced by any document authored by a member of the Committee. We understand the trial court's rationale; however, we conclude that the medical journal articles are privileged because they reflect the Committee's internal review process, including information gathering and deliberations.

As noted above, the Act has been interpreted to protect against disclosure of the "mechanisms of the peer-review process, including information gathering and deliberations." Pietro, 348 Ill. App. 3d at 549; see also Green v. Lake Forest Hospital, 335 Ill. App. 3d 134, 137 (2002); Chicago Trust Co., 298 Ill. App. 3d at 402. Another court noted that the Act protects "the nature and content of an internal review process." Zajac v. St. Mary of Nazareth Hospital Center, 212 Ill. App. 3d 779, 788 (1991). Here, the agenda for the Committee meeting held on February 22, 2002, specifically states that assignments would be given for a "[l]iterature search." The minutes for the February 22 and

February 28, 2002, meetings reflect that assignments were in fact given for a literature search on two specific topics. Further, the agenda for the March 26, 2002, meeting lists one of the tasks for that date as to "[r]eview literature search information." The minutes of the March 26, 2002, meeting indicate that the literature was "available and provided to the members." Moreover, it was at the March 26 meeting that an assignment was first given to develop recommendations and an action plan. The Action Plan contains recommendations related to the topics discussed in the medical journal articles. In her deposition, Rich confirmed that the medical journal articles were obtained through research by members of the Committee. She also stated that the articles were "specific" to decedent's case. Undoubtedly then, obtaining the medical journal articles constituted "information gathering" related to decedent's care and thus was part of the "mechanism" of the peer-review process. See Webster's Third New International Dictionary 1401 (2002) (defining "mechanism" as "a process or technique for achieving a result sometimes by cooperative effort").

In addition, although the trial court correctly noted that the medical journal articles were not attached to any document authored by a Committee member, the record reflects that the articles were used by the Committee in its deliberations. The term "deliberation" has been defined as "a discussion and consideration by a number of persons of the reasons for and against a measure." Webster's Third New International Dictionary 596 (2002). The evidence cited in the previous paragraph illustrates that the Committee obtained the medical journal articles as a result of assignments given during Committee meetings. The minutes from those meetings establish that the medical journal articles were addressed when developing the Action Plan. In fact, the Action Plan includes recommendations related to the topics discussed in the medical journal articles. Thus, the medical journal articles contributed to the Committee's deliberations in that they were obtained as

part of the information-gathering process and they were considered prior to the development of the Action Plan. As a result, their disclosure would reveal the Committee's "internal review process," and the trial court erred in ruling that they are not privileged under the Act.

While our holding is seemingly at odds with precedent stating that the Act does not protect information generated before the peer-review process begins (see Webb, 347 Ill. App. 3d at 825; Chicago Trust Co., 298 Ill. App. 3d at 403; Grandi, 261 Ill. App. 3d at 556; Menoski v. Shih, 242 Ill. App. 3d 117, 120-21 (1993)), a closer examination of Roach, 157 Ill. 2d 29, a case from our supreme court explaining the rationale for such a rule, indicates that this is not the case. In Roach, the supreme court determined that information obtained prior to the commencement of the peer-review process cannot be transformed into privileged information by later reporting it to a peer-review committee. Roach, 157 Ill. 2d at 41. Absent such a rule, the court reasoned, "a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff," thereby providing "scant incentive for advancing the goal of improved patient care" and effectively subverting the purpose of the Act. Roach, 157 Ill. 2d at 41-42. The concerns implicated in Roach are not present here. The medical journal articles did not reference decedent's care. Indeed, the medical journal articles could not reference the care administered to decedent, because they existed before decedent sought treatment at Rush-Copley. As a result, applying the privilege to the medical journal articles would not frustrate the Act's goal of improved patient care, because doing so would not conceal any "adverse facts" known to defendant's medical staff about decedent's care. It is this fact that distinguishes this case from the authorities cited by plaintiff in his brief. All of those cases involve information generated by the defendant hospital's medical staff about the patient or personnel at issue. See Webb, 347 Ill. App. 3d 817 (addressing the applicability of the Act's privilege to an

"occurrence summary" authored by the hospital's former risk manager and four memoranda authored by the same individual summarizing interviews with four doctors, including one of the patient's treating physicians); Chicago Trust Co., 298 Ill. App. 3d 396 (addressing applicability of the Act's privilege to "incident and situational reports" authored by the hospital's medical staff regarding the patient); Grandi, 261 Ill. App. 3d 551 (addressing the applicability of the Act's privilege to conversations between the hospital's administrator, a licensed nurse, and a doctor regarding the patient's care); Menoski, 242 Ill. App. 3d 117 (addressing whether the trial court was entitled to conduct an in camera inspection to determine whether the Act's protection applied to information regarding a hospital's decision to grant privileges to the defendant doctor).[3] In fact, we find that denying the application of the privilege to the medical journal articles would actually frustrate the goals of the Act. See Willing v. St. Joseph Hospital, 176 Ill. App. 3d 737, 744 (1988) ("[T]he

---

[3] Aside from the distinction noted above, it also appears that none of these courts relied exclusively on the fact that the documents were prepared prior to the commencement of the peer-review process. See Webb, 347 Ill. App. 3d at 826-27 (holding that the Act did not protect from disclosure the documents at issue because they were prepared in part to identify any issues of liability); Chicago Trust Co., 298 Ill. App. 3d at 403-04 (noting that affidavits submitted in support of applying Act's privilege to certain documents were contradictory); Grandi, 261 Ill. App. 3d at 556 (rejecting application of Act because of a lack of evidence that the information at issue was obtained at the request of a peer-review committee). Moreover, the principal issue in Menoski did not even involve the applicability of the Act but, rather, whether the trial court abused its discretion in ordering production of the documents at issue for an in camera inspection. Menoski, 242 Ill. App. 3d at 120.

privilege will be accorded only after each document is scrutinized in light of the Act's purpose"). In this regard, revealing aspects of the Committee's thought process would discourage medical personnel from openly discussing their colleagues' actions. See Roach, 157 Ill. 2d at 40.

Plaintiff also argues that the medical journal articles are not privileged because the Act protects only documents and information generated specifically for the use of a peer-review committee. See Green, 335 Ill. App. 3d at 137. It is true that the medical journal articles were "generated" by persons other than members of the Committee. Nevertheless, under the facts of this case, we do not believe that this factor bars the application of the privilege to the medical journal articles, for it is not the contents of the medical journal articles themselves that is significant but, rather, the manner in which the Committee used the medical journal articles and what their use would reveal about the Committee's internal review process. In this regard, we emphasize that the medical journal articles were located as a result of research conducted by members of the Committee during its review of decedent's medical care. The articles were circulated to the entire Committee during its review of decedent's medical care. Further, a review of the medical journal articles in conjunction with the Action Plan indicates that the articles were utilized by the Committee in formulating some of its recommendations. Thus, affording the Act's privilege to the medical journal articles protects the Committee's internal thought process, a process that is unique to the Committee with respect to decedent's care. For the aforementioned reasons, we reverse the trial court's ruling that the medical journal articles are not privileged under the Act.

## 2. Action Plan/Cross-Appeal

With respect to the Action Plan, we must determine if the entire Action Plan is privileged, only part of the Action Plan is privileged, or none of the Action Plan is privileged. Defendant asserts

that the entire Action Plan is privileged because it consists only of "recommendations" and it neither makes any changes to hospital policy nor directs that any actions be taken. In support of this position, defendant relies principally upon Ardisana, 342 Ill. App. 3d 741. In his cross-appeal, plaintiff argues that neither the express language of the Act nor case law applying the Act supports the trial court's ruling that only the implemented recommendations of a peer-review committee's action plan are discoverable. Instead, plaintiff insists that the entire Action Plan is discoverable. Ardisana is instructive to this issue.

In Ardisana, the plaintiff filed a medical malpractice action against the defendant hospital. During discovery, the plaintiff asked the defendant to produce " '[a]ny and all writings, memos or documents pertaining to any conclusions or final recommendations for any peer review process, including the Department of Surgery, pertaining to [the plaintiff].' " Ardisana, 342 Ill. App. 3d at 743-44. The trial court found that the requested documents were discoverable, but the defendant refused to produce them, on the ground that they were privileged under the Act. On review, the appellate court reversed. Ardisana, 342 Ill. App. 3d 747. The court stated that the "results" of the peer-review process, which it defined as the "ultimate decisions made or actions taken by [a] committee, or [a] hospital," are not privileged. Ardisana, 342 Ill. App. 3d 747. However, it held that "recommendations and internal conclusions of peer-review committees, which may or may not lead to those results, are not discoverable." (Emphasis in original.) Ardisana, 342 Ill. App. 3d at 747. In support of its holding, the court cited the "plain language" of the Act, which provides that " 'recommendations' used in the course of internal quality control" are protected from disclosure. Ardisana, 342 Ill. App. 3d at 747; see 735 ILCS 5/8--2101 (West 2004). Thus, Ardisana stands for the proposition that, although the "ultimate decisions made or actions taken" as a result of the peer-

review process are not protected from disclosure under the Act, a peer-review committee's "recommendations and internal conclusions" that may or may not lead to those changes are privileged.

In this case, the Action Plan consists of various "risk reduction strategies" identified by a peer-review committee of defendant hospital.[4] As noted, the trial court determined that some of these recommendations were implemented and some of them were not. The trial court, citing Ardisana, held that the Action Plan's "recommendations which led to the revisions of procedures for medical staff at the hospital" are not privileged because they constitute "ultimate decisions and action taken which were a direct result of the plan and acted upon by the hospital without in [sic] any other formal process of implementation." We respectfully disagree with the trial court's analysis. Instead, we conclude that although the Action Plan was the Committee's "final report," it is protected from disclosure under the Act.

In support of our conclusion, we reproduce the following lengthy, but informative, colloquy from Rich's deposition regarding the sentinel-event process:

"Q. [Plaintiff's attorney:] So then what would typically happen at the sentinel event meetings or what is the next step after they have been convened?

A. [Rich:] We convene the meetings. The first meeting is mostly about confidentiality, mostly about the process, cause analysis, all of the explanation of what this team involves because the core team is not only the core members but it is any ad hoc members that need to be pulled in in direct relationship to this case.

---

[4] In the trial court, plaintiff disputed whether the Committee was a peer-review committee. He does not renew this argument in this appeal.

So then the meeting would convene and we would then have assignments and then we would reconvene and work on assignments and see if any further assignments are needed and it just kind of keeps going from there.

Q. As many as are needed?

A. As many as are needed.

Q. It could be one. It could be a number?

A. That's correct.

Q. Okay. Everybody comes back having done their assignments and then you talk again?

A. To see if anything further needs to be looked at.

Q. Then what?

A. Sometimes assignments would come out of it that would really have no relationship to this case but maybe it came up during the cause analysis and the brainstorming. Maybe something came up that even though it had no direct relationship, core relationship to the case it still could be an assignment.

Q. Then what?

A. Okay. Then we would continue to do this until we felt we had exhausted everything or we had completed our cause analysis and we had exhausted action plans or action items that needed to be exhausted as was brought out in the brainstorming.

Q. Then what?

A. Then the action plans would have implementation dates and outcome expectations.

Q. Who would write the action plans?

A. The team.

Q. Okay.

A. The team does them.

Q. So maybe somebody would have a first draft, bring it to the team?

A. Actually the first draft might come back two or three times. It might come back, and then there might be some taken off and some added. So there might be revisions, two or three revisions.

Q. Until everybody agrees?

A. Correct.

Q. And then that's the final plan?

A. That's the final plan and then, of course, we have outcomes management which then is follow-up.

Q. So--

A. And usually we would have a meeting again or at least not necessarily a meeting but contact to be sure that the action items are being done.

Q. The final plan would have what, if anything, was going to be changed, right?

A. Or recommended changes, uh-huh.

Q. Recommendations or suggestions for changes?

A. Correct.

Q. And that's in all of these meetings. There would always be a final plan?

A. Correct.

Q. And then it would be implemented one way or another?

A. Correct.

Q. I understand. And now you have told us about the procedure?

A. Or a decision why it didn't need to be implemented."

As this passage suggests, the ideas that eventually formed the Action Plan were discussed prior to being put in a written format. Once the team formulated these ideas, they were incorporated into the Action Plan, and a decision was made on which, if any, to implement. This corresponds with Rich's supplemental affidavit, in which she states that the Action Plan consists of "a summary of all of the issues considered by the [Committee] along with suggestions for risk reduction strategies." Although Rich did not state at her deposition who decides which ideas are implemented and who implements the elements of the Action Plan, she related in her supplemental affidavit that the Committee "does not actually make any changes in policy or practice but only provides suggestions." Rich elaborated that the Action Plan does not reflect changes made as a result of the Committee's review. Rather, "others, including medical staff, *** decide if changes in policy or practice will be made." Thus, contrary to the finding of the trial court, the evidence establishes that the Action Plan merely consists of "recommendations or internal conclusions" that may or may not result in changes. Accordingly, this information is protected from disclosure under the Act. However, any actual changes, such as modifications to hospital policy or procedure, that were adopted as a direct result of the recommendations and internal conclusions in the Action Plan must be disclosed, as they constitute the "ultimate decisions made or actions taken" as a result of the peer-review process. Ardisana, 342 Ill. App. 3d at 747. Even less formal decisions or actions taken here, such as the issuance of staff reminders, the revision of a job description, and the reformatting of a report form,

must be disclosed, as the evidence suggests that they were taken as a direct result of the recommendations in the Action Plan.

We emphasize, as did the court in Ardisana (342 Ill. App. 3d at 747), that the Act expressly protects from disclosure "[a]ll *** recommendations" of a peer-review committee. (Emphasis added.) 735 ILCS 5/8--2101 (West 2004). The plain language of the Act does not distinguish between implemented and unimplemented recommendations. Plaintiff suggests that such an interpretation impermissibly broadens the scope of the Act. According to plaintiff, it is not the "general category of 'recommendations' that is privileged, but rather recommendations 'used in the course of internal quality control or of medical study for the purpose of reducing morbidity and mortality, or for improving patient care.' " Plaintiff contends that the Action Plan was not "used in the course of internal quality control." Rather, plaintiff insists, the Action Plan was mandated by the JCAHO and prepared "after completion of the peer review process." Plaintiff's position is unpersuasive. A review of the 33 documents withheld indicates that the Committee was concerned with how to prevent the recurrence of a tragedy similar to the one that befell decedent. Indeed, Rich stated in her initial affidavit that the sentinel-event process was commenced in this case because decedent's death was unexpected. She added that the purpose of the process was to satisfy JCAHO requirements and "to provide internal quality control in order to reduce morbidity and mortality and to improve patient care at the hospital." Rich also stated in her deposition that the issues with which the Committee dealt involved quality improvement. The ideas discussed by the Committee were then incorporated into the Action Plan. In turn, the Action Plan was used by others to implement procedures with the hope of preventing similar tragedies in the future. Thus, contrary to plaintiff's

argument, the evidence establishes that the recommendations outlined in the Action Plan were for "internal quality control."

In light of our finding that the Action Plan was used in the course of internal quality control, the fact that the Action Plan may have been mandated by the JCAHO is a red herring. Rich stated in her affidavit that defendant is accredited by the JCAHO. According to Rich, the JCAHO is "a non-profit organization which critiques and assesses all hospitals in the United States and determines whether they should be accredited." Rich further stated that, "[i]f the JCAHO became aware of a sentinel event occurring at a hospital and the hospital did not conduct an acceptable root cause analysis and action plan, the hospital was at risk for being placed on an Accreditation Watch, jeopardizing its accreditation." As the supreme court noted in <u>Niven</u>:

"Without the materials the [JCAHO] would not accredit Illinois hospitals, and thus there would be no such thing as an accredited hospital. The grant of confidentiality to 'accredited hospitals' would therefore be a meaningless act. This court will not presume that the legislature intended a meaningless act." <u>Niven</u>, 109 Ill. 2d at 367.

While the <u>Niven</u> court was speaking in the context of documents in the possession of the JCAHO and sought by the plaintiff, the same rationale applies here. Absent hospital compliance with JCAHO mandates regarding sentinel events, there would be no accredited hospitals in Illinois and there would be no need for the legislature to have included accredited hospitals in the Act's coverage. This absurd result could not have been intended by the legislature, especially here, where the Action Plan also was used in the course of internal quality control. Cf. <u>Ekstrom</u>, 197 Ill. App. 3d at 128-29 (holding that the Act did not exempt from discovery information pertaining to compliance with

JCAHO guidelines and standards since the records were not necessarily the type of materials to which the Act is applicable).

To be sure, there are cases predating Ardisana that contain language that could be interpreted as holding that a peer-review committee's "final report" is not protected from disclosure under the Act. However, Ardisana clarified this point. Moreover, a closer examination of these cases reveals that they are not incompatible with either our holding or Ardisana. For instance, in Chicago Trust Co., 298 Ill. App. 3d at 406, the court determined that certain documents were not privileged under the Act. In the course of its discussion, the court stated that the Act "does not protect against disclosure of the peer-review committee's recommendations after completion of the peer-review process." Chicago Trust Co., 298 Ill. App. 3d at 405. Nevertheless, the precise holding of the case was that the documents in question were not protected from disclosure under the Act because they were not initiated, created, prepared, or generated by a peer-review committee. Chicago Trust Co., 298 Ill. App. 3d at 405. More important, a review of the descriptions of the documents ordered produced in Chicago Trust Co. suggests that they were not the "recommendations and internal conclusions" of the peer-review committee itself. Chicago Trust Co., 298 Ill. App. 3d at 399 (describing the documents in question). Rather, they were the "ultimate decisions made or actions taken" in response to the peer-review committee's action plan. In fact, one of the documents expressly referenced that it was written in response to an "action plan," and the hospital conceded that the documents "represent the results" of the peer-review process. Chicago Trust Co., 298 Ill. App. 3d at 399, 405. Therefore, Chicago Trust Co. actually supports our analysis.

It is also significant that the three cases cited by Chicago Trust Co. for the proposition that the Act does not protect against disclosure of a peer-review committee's recommendations (see

Richter v. Diamond, 108 Ill. 2d 265, 269 (1985); Willing, 176 Ill. App. 3d 737, 743; Gleason v. St. Elizabeth Medical Center, 135 Ill. App. 3d 92, 95 (1985), overruled on other grounds, Reagan v. Searcy, 323 Ill. App. 3d 393 (2001)) predate the amendment to the Act that added protection for such "recommendations." See Pub. Act 89--393, §15, eff. August 20, 1995 (amending 735 ILCS 5/8--2101 (West 1994)). In any event, we do not interpret any of the cases relied on by the court in Chicago Trust Co. to hold that recommendations made by a peer-review committee are not privileged.

In Richter, the supreme court held that information relating to "the nature and extent of restrictions" imposed upon a physician's privileges was not protected under the Act. Richter, 108 Ill. 2d at 269. In so holding, the court noted that "restrictions imposed by a hospital on a particular doctor's privileges to practice there may result from or be the consequence of the peer-review process, or of other internal methods of monitoring and reviewing hospital activity." (Emphasis added.) Richter, 108 Ill. 2d at 269. Thus, Richter did not hold that recommendations made by a peer-review committee are not privileged. Rather, it supports the proposition that the "ultimate decisions made or actions taken," i.e., the restrictions placed on a physician in response to the peer-review process, are not privileged under the Act. Richter, 108 Ill. 2d at 269. The Richter court cited Gleason in support of its holding. Richter, 108 Ill. 2d at 269-70. In Gleason, the court held that the defendant hospital was required to respond to interrogatories seeking information regarding the steps the hospital took to supervise a physician after depositions were taken in other malpractice cases filed against the physician. Gleason, 135 Ill. App. 3d at 94-95. In Gleason, there was no evidence that any of the information sought by the plaintiff's interrogatories involved the work product of any review committee. In fact, the court stated that the plaintiff "does not seek information or reports

of the type protected by the statute, but, rather, concerns only <u>actions taken</u> by the hospital" as a result of the peer-review process. (Emphasis added.) <u>Gleason</u>, 135 Ill. App. 3d at 94-95. Therefore, <u>Gleason</u> does not hold that recommendations made by a peer-review committee are discoverable. Nor do we interpret <u>Willing</u> as holding that recommendations made by a peer-review committee are not privileged. In that case, the court considered whether certain documents, including a physician's applications for appointment and letters of resignation or withdrawal, were protected from disclosure under the Act. In finding that the documents were not so privileged, the court specifically determined that the physician's applications for appointment and letters of resignation or withdrawal were either "antecedent or subsequent to" but not part of the peer-review process. <u>Willing</u>, 176 Ill. App. 3d at 743. The court stressed that "records and documents are protected under the Act if they are utilized as part of the peer-review process and not as a result or consequence thereof." <u>Willing</u>, 176 Ill. App. 3d at 744.

A more recent case, <u>Green</u>, 335 Ill. App. 3d 134, addressed whether documents from a nurse's personnel file, including a suspension form, were privileged under the Act. The specific holding was that the suspension form was not "generated for the use of a peer-review committee" and therefore was not privileged. <u>Green</u>, 335 Ill. App. 3d at 137. However, citing to <u>Chicago Trust Co.</u>, the court alternatively held that, even if the nurse's suspension was recommended by a peer-review committee, "such a finding would not be protected from disclosure because the recommendations and findings of a peer-review committee are not privileged under the Act." <u>Green</u>, 335 Ill. App. 3d at 138. Despite this language, <u>Green</u> does not support the proposition that a peer-review committee's "recommendations or internal conclusions" are not privileged under the Act. The fact of the matter is that the nurse in <u>Green</u> <u>was</u> suspended. <u>Green</u>, 335 Ill. App. 3d at 135. Thus, the suspension form

would not be privileged under the Act because it represented the "ultimate decisions made or actions taken."

The language used in the aforementioned cases, particularly Chicago Trust Co. and Green, has led to some confusion. However, as we discuss above, these cases ultimately support Ardisana as well as our holding in this case. That is, the plain language of the Act protects from disclosure any recommendations made and internal conclusions reached by a peer-review committee, regardless whether they are implemented. However, any actual changes, such as modifications to hospital policy or procedure, that are adopted as a direct result of the committee's recommendations and internal conclusions must be disclosed, as they constitute the "ultimate decisions made or actions taken" as a result of the peer-review process. Accordingly, we reverse the trial court's order requiring defendant to produce the Action Plan. In this case, the Action Plan consists only of "recommendations and internal conclusions." Therefore, it is privileged in its entirety.

### 3. Contempt

We next address the status of the contempt order. "Requesting that a trial court enter a contempt order is a proper procedure to seek immediate appeal of a trial court's discovery order." Ardisana, 342 Ill. App. 3d at 749. Like the defendant in Ardisana, defendant's decision in this case not to produce the documents in question was not contemptuous of the trial court's authority. Rather, defendant's refusal to tender the requested documents was made in good faith and based on sound legal arguments. We therefore vacate the order finding defendant in contempt and imposing a $100 fine.

### B. Case No. 2--07--1272

-26-

Nos. 2--07--0717 & 2--07--1272 cons.

Case No. 2--07--1272 concerns the three questions certified by the trial court. The first question asks, " Is the applicability of the Medical Studies Act privilege to a peer review committee's final report dependent upon 'implementation' of that report by later, non peer review committees?" As our analysis with respect to the issues in case No. 2--07--0717 indicates, to the extent that the "final report" consists solely of "recommendations and internal conclusions" of the peer-review committee, it is irrelevant whether a non-peer-review committee later "implements" one of the recommendations.

Although the parties do not directly address the second and third certified questions in their briefs, we address them. Question two asks, "Is the discoverability of a peer review committee's final report dependent on later use of the report by other, non peer review departments?" Again, we emphasize that, if the peer-review committee's final report consists solely of "recommendations and internal conclusions," it is not discoverable even if the final report is disclosed to a non-peer-review committee. See 735 ILCS 5/8--2102 (West 2004) ("The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility"); Webb, 347 Ill. App. 3d at 825, quoting Chicago Trust Co., 298 Ill. App. 3d at 405 ("A document that 'was initiated, created, prepared, or generated by a peer-review committee' is privileged under the Act, 'even though it was later disseminated outside the peer-review process' "). Whether it is "used" by such a committee is again irrelevant. However, any actual changes that were adopted as a direct result of the recommendations and internal conclusions in the action plan must be disclosed, as they are the "ultimate decisions made or actions taken" as a result of the peer-review process. Ardisana, 342 Ill. App. 3d at 747. The third certified question asks, "If a later, non peer review committee considers whether to take action as a result of a final

report, does the Medical Studies Act protect disclosure of the final report they used or any other materials that they considered?" The answer to this question is dependent upon the origin and contents of the information. As noted above, any information that is privileged under the Act is protected from disclosure even if it is disseminated or used outside of the peer-review process. 735 ILCS 5/8--2102 (West 2004). Thus, the "final report" and "other materials" would have to be examined individually.

### III. CONCLUSION

For the reasons set forth above, we reverse the ruling of the trial court requiring defendant to produce the medical journal articles and the Action Plan. Further, we vacate the order finding defendant in contempt and the accompanying fine. We remand this cause for further proceedings.

No. 2--07--0717, Reversed in part and vacated in part; cause remanded.

No. 2--07--1272, Certified questions answered; cause remanded.

BOWMAN and O'MALLEY, JJ., concur.