In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1966

BRADLEY BOTVINICK,

*Plaintiff-Appellant*,

*v.*

RUSH UNIVERSITY MEDICAL CENTER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-02054—**Ronald A. Guzmán**, *Judge.*

ARGUED APRIL 6, 2009—DECIDED JULY 24, 2009

Before BAUER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* After Bradley Botvinick completed his residency in anesthesiology at Rush University Medical Center ("Rush"), he obtained employment with Anesthesiology Associates of Dunedin ("AAD"), a Florida doctors' association. Botvinick lost that job, however, when the hospital where AAD doctors practice denied Botvinick's application for clinical privileges. Believing that Rush sabotaged his application by feeding the

hospital false, petty information about his reputation, Botvinick sued Rush and several of its doctors for tortious interference with his expectation of employment. The district court granted the defendants' motion for summary judgment, concluding that Botvinick lacked evidence that the defendants interfered with his application for privileges. We agree with the district court that Botvinick failed to create a genuine issue of material fact on his tortious interference claim and, accordingly, affirm.

## I. Background

Botvinick was a resident in Rush's anesthesiology department from 2004 to 2005. Although Botvinck's clinical skills were solid, his professional reputation came under fire amid a departmental scandal involving sex, lies, and possibly identity theft. In December 2004, Dr. Heather Nath, an attending physician at Rush, received an uninvited delivery of sexually explicit items from the "Lover's Lane" company. Nath, unamused by this sophomoric prank, complained to the department head and decided to do a little investigating of her own. Nath's first clue as to the prankster's identity was the Lover's Lane delivery invoice, which conspicuously identified "Brad Botvinick" as the purchaser.

Botvinick countered with evidence that he was framed. Rush's data processing department had tracked down the computer used to place the Lover's Lane order, and Botvinick claimed that he was nowhere near that computer, or even in the same building, at the time of the order. Botvinick deduced that the real culprit stole his

credit card and used it to go on a Lover's Lane online spending spree. Rush apparently either accepted this explanation or simply dropped the matter, as Rush never took formal disciplinary action against Botvinick in connection with this sex-toy scandal.

Near the end of his residency, Botvinick entered into an employment contract with AAD, an association of doctors who practice at two Florida hospitals connected to Morton Plant Mease Health Care ("Morton"). Since AAD doctors work at Morton, Botvinck's employment at AAD depended on receiving clinical privileges to practice at Morton. In April 2005, Morton gave Botvinick temporary privileges in connection with his new job at AAD, and Botvinick began Morton's application process for permanent privileges. Among the references that Botvinick provided to Morton's credential committee were Drs. David Rothenberg and Kenneth Tuman, attending physicians at Rush. Botvinick assumed that Morton, in turn, sent Rothenberg and Tuman evaluation forms to complete. Dr. Anthony Ivankovich, Botvinick's supervisor at Rush, also sent Morton a letter regarding Botvinick's qualifications.

After completing Rush's residency program in June 2005, Botvinick was set to move out to Florida for his job with AAD. Morton's credential committee, however, would soon upset Botvinick's career plans. On August 1, Botvinick received a phone call from Dr. Bruce Fagan, the head of AAD's anesthesiology department, who said that Morton had received negative evaluations on Botvinick. The next day, Botvinick received another phone call

from Dr. Bernard Macik, a member of Morton's credential committee, who also referred to negative evaluations and informed Botvinick that Morton was suspending his temporary privileges. Botvinick testified that he assumed that these negative evaluations came from Rothenberg and Tuman, although he acknowledged that Macik did not identify the source of the negative information.

At that point, Botvinick's prospects for privileges at Morton were looking grim, but Morton had not yet completed its evaluation. Dr. Richard Shea, also a member of Morton's credential committee, requested to speak with Ivankovich about Botvinick. On August 15, Shea faxed Ivankovich a "Release and Immunity" that Botvinick signed in connection with his application to Morton. That release extended "absolute immunity" to third parties like Ivankovich who provided information regarding Botvinick's professional competence and character. Confident with the release's assurance that Botvinick had "agree[d] not to sue" him for statements made to Morton, Ivankovich had a phone conversation with Shea about Botvinick's application. Whatever Ivankovich said was apparently insufficient to convince Shea that Botvinick was Morton material, for Morton soon sent Botvinick a letter stating that it was not inclined to grant his application for permanent privileges. Botvinick then withdrew his application, fearing that a formal denial would appear in a national database and permanently taint his professional reputation.

On March 3, 2006, Botvinick filed a complaint in Illinois state court against Rush, Ivankovich, Rosenberg, Tuman,

Nath, and Dr. Wayne Soong, another physician at Rush, alleging that the defendants tortiously interfered with his expectation of employment at AAD. Botvinick theorized that the defendants induced Morton to deny his application for privileges by telling Morton about his involvement in the 2004 sex-toy scandal. After removing the case to federal court based on diversity jurisdiction, the defendants moved to dismiss on a number of grounds, including the Illinois Medical Studies Act ("IMSA"). The IMSA makes privileged any information regarding "a health care practitioner's professional competence" used by a hospital credential committee "in the course of internal quality control." 735 ILCS 5/8-2101. According to the defendants, the IMSA prevented Botvinick from using any communications between Rush physicians and Morton's credential committee as the basis for a tort action. The court denied the motion to dismiss but, relying on the IMSA, entered a protective order preventing Botvinick from discovering "the oral and/or written communications between Drs. Ivankovich, Rothenberg, Tuman or any other Rush physician and the Morton Plant Mease Health Care facility's Credentials Committee or any of its authorized representatives." In a motion to clarify the protective order, Botvinick requested that the court direct the defendants to answer all deposition questions regarding their communications with Morton and, after examining their responses, determine which communications were inadmissable under the IMSA. The court denied the motion. At a subsequent motions hearing, the court also declined to rule in the abstract on which particular communications between Rush and

Morton were privileged. Instead, the court directed the parties to document any questionable assertions of privilege made during depositions and follow up with a motion to compel a response. Ivankovich did interpose privilege objections during his deposition, but, perhaps foreshadowing the beginning of the end for Botvinick, no motion to compel followed.

After the taking of depositions, the defendants moved for summary judgment on Botvinick's tortious interference claim. Accompanying the defendants' motion were affidavits submitted by Drs. Rothenberg, Tuman, Nath, and Soong stating that they did not provide any written or oral evaluations about Botvinick to Morton's credential committee. The district court granted the defendants' summary judgment motion. The court reasoned that all of the defendants except Ivankovich could not have tortiously interfered with Botvinick's application for privileges because they never provided any evaluations to Morton. Ivankovich was also entitled to summary judgment, the court concluded, because Botvinick lacked evidence that any information provided by Ivankovich caused Morton to terminate Botvinick's privileges. Botvinick appeals.

## II. Analysis

We review de novo the district court's grant of summary judgment in favor of the defendants. *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007). Summary judgment is proper if the record shows no genuine issue of material fact on Botvinick's claim of tortious interference with

a business expectancy. *See id.* (citing Fed. R. Civ. P. 56(c)). Under Illinois law, the elements of that claim are "(1) [the plaintiff's] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). To avoid summary judgment, Botvinick must present evidence creating a triable issue of fact on each contested element.

We conclude that Botvinick has failed to create a triable issue on element (3) because he has no evidence that the defendants "prevented" him from obtaining clinical privileges at Morton. Four of the five physician defendants—Drs. Rosenberg, Tuman, Nath, and Soong—swore that they never provided evaluations about Botvinick to Morton's credential committee. Although Botvinick speculated at his deposition that Rosenberg and Tuman provided the negative evaluations referenced by Morton, he also acknowledged that he did not know the source of those evaluations. Botvinick has not shown that these four defendants took "action . . . directed towards the party with whom the plaintiff expects to do business." *Grund v. Donegan*, 700 N.E.2d 157, 161 (Ill. App. Ct. 1998); *see also OnTap Premium Quality Waters, Inc. v. Bank of N. Ill., N.A.*, 634 N.E.2d 425, 432 (Ill. App. Ct. 1994) (dismissing a complaint of tortious interference that was "devoid of any allegation that defendant directed any action which purposefully caused the [third party] not to enter into a business relationship with plaintiff").

As for the fifth physician defendant, Dr. Ivankovich, although Ivankovich spoke with Dr. Shea about Botvinick, Botvinick has no evidence that Morton relied on this conversation in denying his application. Indeed, we have no idea what information Morton relied on because Botvinick failed to take any discovery from Morton. Without evidence of why Morton terminated his privileges, Botvinick cannot show that the communications of any particular defendant, including Ivankovich, influenced Morton's decision. *See Ali*, 481 F.3d at 945 (7th Cir. 2007) ("[O]nly when the actions of a third party cause an employer to decide to fire an . . . employee, the third party might be liable in tort."); *Bus. Sys. Eng'g, Inc. v. IBM Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (concluding that the plaintiff lacked evidence that the defendant's provision of computer services to a client interfered with the plaintiff's consulting relationship with the client), *aff'd*, 547 F.3d 882 (7th Cir. 2008); *Otterbacher v. Northwestern Univ.*, 838 F. Supp. 1256, 1261 (N.D. Ill. 1993) (dismissing a discharged employee's tortious interference claim based on the failure to allege that the defendant influenced the decisionmaker). Botvinick has not created a triable issue on an essential element of his tortious interference claim, and the district court properly granted summary judgment in favor of the defendants.

Botvinick argues that he would have developed more evidence in support of his tortious interference claim were it not for the district court's protective order, which prevented Botvinick from discovering any communications between the defendants and Morton's credential

committee. Botvinick further argues that the order was erroneous because it relied on an overly broad interpretation of the Illinois Medical Studies Act. If, as Botvinick suspects, Ivankovich told Shea that Botvinick was involved in the 2004 sex-toy scandal, that information is not privileged under the IMSA because it does not relate to Botvinick's "professional competence." 735 ILCS 5/8-2101.

As the defendants point out, Botvinick may have forfeited his challenge to the breadth of the district court's protective order by failing to pursue available discovery remedies. At a hearing prior to the taking of depositions, the court instructed Botvinick to document any questionable assertions of the IMSA privilege made by the defendants. Heeding these instructions, after Ivankovich refused to answer Botvinick's question about his conversation with Shea, Botvinick certified the question on the record. Yet Botvinick never returned to the district court with a motion to compel Ivankovich's response to whether he told Shea about the sex-toy scandal. Because Botvinick did not bring this specific communication to the district court's attention, he has probably forfeited his argument on appeal that the communication falls outside the IMSA privilege. *See United States v. Roberts*, 534 F.3d 560, 571-72 (7th Cir. 2008) (finding that the defendant forfeited a claim that the government withheld evidence by failing to file a specific discovery request or ask for a hearing); *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1149 (7th Cir. 1989) (concluding that the defendant forfeited its argument against the introduction of summaries of expense records by failing to move to compel discovery of the records).

Assuming, however, that Botvinick has preserved his argument that the district court's interpretation of the IMSA privilege was too broad, we suspect that Botvinick's interpretation is too narrow. True, the IMSA privilege covers only information relating to a physician's "professional competence." 735 ILCS 5/8-2101. And involvement in the type of sexual prank that occurred here does not as obviously undermine a physician's "professional competence" as does his failure to diagnose a life-threatening condition, *see Anderson v. Rush-Copley Med. Ctr., Inc.*, 894 N.E.2d 827, 830 (Ill. App. Ct. 2008), negligence in performing surgery, *see Stricklin v. Becan*, 689 N.E.2d 328, 329-30 (Ill. App. Ct. 1997), or falsification of patient records, *see Tabora v. Gottlieb Mem'l Hosp.*, 664 N.E.2d 267, 269, 273-74 (Ill. App. Ct. 1996). Still, a hospital has a legitimate interest in information about a prospective doctor's ability to conduct himself honestly and professionally and to refrain from offensive behavior. Interpreting the IMSA privilege to include such information seems consistent with the Act's purpose of encouraging physicians to provide "frank evaluations of their colleagues." *Anderson*, 894 N.E.2d at 834.

Ultimately, this case does not require us to determine the precise contours of the IMSA privilege. Even if we accepted Botvinick's argument that the district court's interpretation of the privilege was overly broad, we would still conclude that Botvinick's tortious interference claim cannot survive summary judgment. As discussed above, Botvinick has no evidence of why Morton terminated his privileges, mainly due to his

failure to take discovery from Morton on this point. So assuming that Botvinick could show that Ivankovich told Shea about the sex-toy scandal, he would still lack evidence that Morton relied on that information. Notably, some evidence in the record suggests that anything that Ivankovich may have said about the scandal was inconsequential to Morton's decision. It was early August 2005, before Ivankovich spoke with Shea, when Dr. Macik informed Botvinick that Morton was suspending his temporary privileges. Botvinick also testified that he did not recall any mention of "sex toys" during his conversation with Macik. Granted, Morton did not make its final decision until after Ivankovich spoke with Shea, making it at least possible that Ivankovich derailed Botvinick's application by telling Shea about the sex-toy scandal. Still, what little evidence exists suggests that the scandal did not influence Morton's decision, and Botvinick has not countered with evidence suggesting that it did. *See Compania Administradora de Recuperacion v. Titan Int'l, Inc.*, 533 F.3d 555, 562 (7th Cir. 2008) (To avoid summary judgment, "a party must point to specific evidence that creates a genuine issue of material fact for trial."). Botvinick has failed to create a triable issue on an essential element of his tortious interference claim, whether the defendants' communications with Morton prevented him from realizing his employment at AAD. *See Fellhauer*, 568 N.E.2d at 878. Based on this failure alone, the district court's grant of summary judgment in favor of the defendants can be affirmed.

We finally note that, even if Botvinick had established the essential elements of his tortious interference claim,

it is doubtful that this claim would survive the numerous other defenses raised by the defendants. The strongest of these is the "Release and Immunity" that Botvinick signed in connection with his application for privileges at Morton. That release authorized third parties to provide Morton with any information "bearing on [Botvinick's] professional qualifications, credentials, clinical competence, character, ability to perform safely and competently, ethics, behavior, or any other matter reasonably having a bearing on [his] qualifications for initial and continued appointment to the medical staff." The release further provided that Botvinick would "extend absolute immunity to, release from any and all liability, and agree not to sue" either third parties or Morton for any matter relating to his application for privileges. It is difficult to see how this broad, explicit language does not immunize the defendants from tort liability for anything they may have told Morton about Botvinick.

Botvinick argues that, in signing the release, he did not intend to immunize the defendants for giving Morton false information about his role in the sex-toy scandal. However, under Illinois law, if a written release is clear and unambiguous, the court determines the parties' intent from the plain language of the document. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). The clear intent of this broad release from "any and all" liability is to protect Rush physicians who communicated with Morton against the type of tort suit that Botvinick brings here. *See id.* at 714-15. Of course, to the extent that Botvinick alleges that the defendants knowingly lied by

telling Morton that Botvinick was behind the sex-toy scandal, a release that purported to immunize such a deliberate falsehood might be invalid as a matter of public policy. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 252 (7th Cir. 1994) ("Illinois does not enforce contracts exculpating persons from the consequences of their wilful and wanton acts."). But Botvinick does not challenge the release on this ground, and, as discussed above, his tortious interference claim fails for other reasons. We need not decide whether the defendants would prevail in this case based solely on the release.

### III. Conclusion

The grant of summary judgment in favor of the defendants is AFFIRMED.

7-24-09