2018 IL App (1st) 171107

SIXTH DIVISION
July 27, 2018

No. 1-17-1107

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BARRY MNOOKIN, Independent Executor of the Estate of Millicent E. Mnookin, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| NORTHWEST COMMUNITY HOSPITAL, an Illinois Corporation; MIDWEST ANESTHESIA PARTNERS, LTD., an Illinois Corporation; SYED AHMED, M.D., Individually; KAREN LEIDER, R.N., Individually; BARBARA SLAGER, R.N., Individually; VALARIE LAWRY, R.N., Individually; WOMANCARE, P.C., an Illinois Corporation; and SHERI MERCHANT, M.D., Individually, | ) ) ) ) ) ) ) ) ) ) ) | No. 15 L 11868  Honorable Moira Susan Johnson, Judge Presiding. |
| Defendants | ) ) | |
| (Northwest Community Hospital, Defendant-Appellant). | ) ) | |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Cunningham and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, Barry Mnookin, independent executor of the Estate of Millicent E. Mnookin, deceased, filed a medical malpractice and wrongful death action against Northwest Community Hospital (NCH) and other defendants. Plaintiff alleged that after decedent underwent surgery at NCH, she went into cardiac arrest and subsequently passed away. During discovery, plaintiff

served written interrogatories and a request for production of documents on NCH. NCH presented a privilege log, asserting a privilege to the listed documents, premised on the Medical Studies Act (Act) (735 ILCS 5/8-2101 *et seq.* (West 2014)). Plaintiff moved for an *in camera* inspection of the documents listed in NCH's privilege log, asking the trial court to make a determination on discoverability. After conducting an *in camera* review of the documents identified in the privilege log, the trial court overruled NCH's claim of privilege under the Act as to 17 of the documents and sustained NCH's claim of privilege as to 7 of the documents. NCH then moved for a finding of "friendly" contempt, in order to appeal the trial court's ruling on the production of the disputed documents. The trial court entered an order holding NCH in civil contempt pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) for its failure to produce the 17 documents in question and sanctioned NCH $500. NCH now appeals. For the following reasons, we reverse the trial court's discovery order, vacate the contempt order, and remand for further proceedings.

¶ 2                                    BACKGROUND

¶ 3     On May 13, 2015, the decedent, while under general anesthesia, allegedly suffered a drop in oxygen levels and cardiac arrest during a surgical procedure at NCH. The decedent was taken to the intensive care unit (ICU) and subsequently passed away on May 28, 2015.

¶ 4     On November 20, 2015, plaintiff filed suit against NCH; Dr. Syed Ahmed, the anesthesiologist during the decedent's surgery; and other defendants. Plaintiff alleged various acts of negligence by Dr. Ahmed, as an employee, agent, or apparent agent of NCH, during the surgery. Plaintiff sent NCH requests for production of documents, and in response, NCH filed a privilege log and then later an amended privilege log. In the amended privilege log, NCH identified 24 separate documents (Document Nos. 1 through 24) as privileged and protected

under the Act. Document No. 1 was titled "Quality Management Worksheet Confidential Peer Review Information, Anesthesia and Pain Medicine." Document No. 2 was titled "Quality Management Worksheet, Confidential Peer Review Information Obstetrics/Gynecology." Document No. 3 was titled "OB/GYN Quality Improvement Audit Committee Minutes." Document Nos. 4, 5, and 6 were titled "Anesthesia Quality Improvement Audit Committee Minutes." Document Nos. 7, 8, and 9 were titled "NCH Medical Staff Quality Committee Minutes." Document No. 10 was titled "Sentinel Event Measures of Success Draft Report." Document No. 11 was titled "Sentinel Event Measures of Success Summary Report." Document Nos. 12 through 16 were titled "Root Cause Analysis Framework." Document No. 17 was titled "Patient Safety Event Debriefing Meeting Notes Pursuant to Root Cause Analysis Investigation." Document No. 18 was titled "Organization Self Report to the Joint Commission." Document Nos. 19 through 23 were titled "Meeting Notes Pursuant to Root Cause Analysis Investigation." Document No. 24 was titled "Summary Report to the Joint Commission for Sentinel Event Number 224628."

¶ 5       On September 23, 2016, plaintiff filed a motion asking the trial court to conduct an *in camera* inspection of all the documents listed in NCH's amended privilege log. On November 4, 2016, the trial court asked NCH to redact the portion of each privileged document for which NCH claimed privilege. In response, NCH redacted the entire text of each document except for printed headings. On December 5, 2016, a hearing was held on the privileged documents. At that hearing, the trial court stated that it had gone through the "remainder of the documents that defendants are claiming privilege; and in substance, I can agree with most of what it is that they're trying to claim falls under the [A]ct." The trial court stated, "The concerns that I have fall

with information that had to have been or should have been contained in medical records of some sort that were then used in support of providing data to the group." The trial court went on to say:

> "When I look at these forms and I see under, for example, root cause in some spots, there are places where it's clear that information had to have been given from the medical records, and I want to be sure that those medical records had been tendered to the plaintiff, or where there is an indication of abstract, I want to know those records from which the abstract occurs, those record were given to the plaintiff."

¶ 6 The trial court then held a brief recess and afterward stated that it wanted NCH to provide it with more information and set a new hearing date.

¶ 7 On December 22, 2016, plaintiff requested that NCH produce "all non-privileged documentation regarding any and all morbidity and mortality conferences held regarding [the decedent]." NCH filed a response to the motion that included affidavits from Katie Viggiano, Tiffany Ferguson, Claudia Ronayne, and Dr. Alan Loren, all attesting to the privileged nature of the documents described in the amended privilege log. The contents of these affidavits will be discussed in more detail below, but we will briefly discuss them here.

¶ 8 Ronayne, the executive director of service excellence of NCH, stated in her affidavit that the Department of Service Excellence is the quality department of NCH that is responsible for overseeing and implementing activities of the hospital relating to quality improvement, peer review, patient safety and outcomes, and accreditation and certification. She stated that her responsibilities include leading the Quality and Patient Safety Committee, which is a committee whose charge is to monitor, initiate, guide, and coordinate organization-wide quality assessment and improvement and patient safety activities. It is an internal quality committee of the hospital

formed for the purpose of internal quality control and patient safety. Ronayne also ensures compliance with external regulatory agencies and external reporting, including reporting to the Joint Commission, an independent organization that accredits and certifies health care organizations across the country.

¶ 9    Ronayne also stated in her affidavit that she is familiar with the peer review process that takes place within the various departments of NCH. Each medical staff department has a department-specific quality committee to provide a mechanism for monitoring and evaluating the quality and appropriateness of patient care rendered by physicians within the department. Each department has established indicators for peer review by the department-specific quality committee. The Department of Anesthesia has indicators for peer review which are quality screening criteria, and when one is met, it triggers the peer review process within the department. The Department of Obstetrics and Gynecology also has indicators for peer review, and when one is met, it triggers the peer review process within the department. The indicators for review for both departments were attached to Ronayne's affidavit and included triggers like death and adverse outcomes.

¶ 10    Ronayne further stated in her affidavit that based on the circumstances surrounding the decedent's care, one or more of the indicators for review established by the two departments were met. As a result, this triggered the initiation of peer review processes within each department that were conducted by the Anesthesia Quality Improvement Audit Committee and the OB/GYN Quality Improvement Audit Committee, two peer review committees providing a mechanism for monitoring and evaluating the quality and appropriateness of patient care rendered by physicians.

¶ 11    Viggiano, a quality improvement resource specialist in the Department of Service Excellence of NCH, stated in her affidavit that she provides support for medical staff peer review quality initiatives and activities, performs ongoing reviews of cases and events that meet quality review indicators, monitors monthly reporting for case identification, and monitors the performance of case reviews and support of department-specific quality improvement committees. In her role as a quality improvement resource specialist, she assembles information and prepares data at the direction and for the use of the OB/GYN Quality Improvement Audit Committee through the creation of quality management worksheets. Viggiano stated that the Medical Staff Quality Committee is another committee of NCH that is an internal quality committee formed for the purpose of internal quality control and patient safety. The committee has the authority to conduct internal review and investigation of incidents relating to peer review, quality and patient safety, and medical staff education.

¶ 12    Ferguson stated in her affidavit that at the time of the incident, she was a quality improvement resource specialist in the Department of Service Excellence at NCH. In that role, she provided support for medical staff peer review quality initiatives and activities, performed ongoing reviews of cases and events that met quality review indicators, monitored monthly reporting for case identification, and monitored the performance of case reviews and support of department-specific quality improvement committees. In her role as quality improvement specialist, she assembled information and prepared data at the direction of the Anesthesia Quality Improvement Audit Committee through the creation of quality management worksheets.

¶ 13    Dr. Loren, NCH's chief medical officer, stated in his affidavit that he was a member of the Quality Committee of the Board of Directors of NCH at the time of the incident, as well as a member of the Quality and Patient Safety Committee of NCH. Dr. Loren stated that he was

authorized to direct the performance of root cause analysis investigations of patient care, which are done for the purpose of improving the quality of patient care and reducing the risk of similar events occurring in the future.

¶ 14    On January 20, 2017, the court held another hearing regarding the privileged documents. Defense counsel argued that once the privilege was established for the documents under the Act, all information, statements, interviews, or anything contained in those documents is afforded the protection of the Act. Defense counsel noted that he had provided the affidavits of individuals that averred those documents were prepared at the request of and for the use of the Anesthesia Quality Improvement Audit Committee and the OB/GYN Quality Improvement Audit Committee.

¶ 15    The trial court stated that it

    "wanted to be sure that what defendants are not doing in these cases is taking information that is in a medical record, generating some piece of paper and giving it to the peer review and then not disclosing the information to the plaintiff saying we have a privilege, and we used this information and you can't have it."

Defense counsel argued that was not the standard, stating:

    "The documents we have provided to your Honor for review are notes taken and the framework documents taken during the root cause analysis meetings and discussions that occurred during those meetings and the things that people said during those meetings, which is the entire purpose of the Act, so which is to encourage frank discussion among peers about what happened, what does everybody remember, and that's the whole purpose of the Act."

The trial court stated that it would "overrule the privilege, and you can bring your motion for [Illinois Supreme Court Rule] 308(a) language."

¶ 16    On February 10, 2017, another hearing was held in this matter. Defense counsel stated that after the last hearing, plaintiff's counsel agreed to submit a list of any of the documents that plaintiff conceded was privileged. Plaintiff's counsel then submitted a list identifying Document Nos. 3 through 9, which represented the meeting minutes from the quality control meetings that were held on this matter.

¶ 17    On March 10, 2017, defense counsel asked the trial court to hold him in friendly contempt, arguing that it was the most expeditious way to get the issue of privilege to this court. The trial court responded:

> "The way I've been handling it lately is instead of the friendly contempt, which the
>
> Appellate Court does not like, they don't like friendly contempt, I've been finding that
>
> the defendant is willful and contumacious and enter a $100 per day sanction. This is a[n]
>
> [Illinois Supreme Court Rule] 219(c) sanction as opposed to a finding of contempt."

The trial court stated, "So I'm finding willful and contumacious behavior for failing to obey the motion to compel under 219(c). I'm entering a $100 a day sanction against you to compel you and coerce you to comply."

¶ 18    On April 7, 2017, the trial court entered an order stating that due to NCH's refusal to produce the documents in question, the court would hold NCH in civil contempt pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) for failure to comply with the orders entered on February 10, 2017, and March 10, 2017. The trial court reduced the daily sanction entered on March 10, 2017, from $100 per day to $500 total, and "that amount shall be purged upon the production of documents within 35 days." NCH then filed a notice of appeal pursuant

to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), appealing the trial court's April 7, 2017, order holding NCH in civil contempt for failing to produce Document Nos. 1, 2, and 10 through 24 of its amended privilege log.

¶ 19                                            ANALYSIS

¶ 20    On appeal, NCH contends that under the plain language of the Act, NCH's amended privilege log, Document Nos. 1, 2, and 10 through 24 are privileged and protected from discovery in their entirety. Plaintiff responds that the trial court properly ruled that the documents in question were not exempt from discovery by a purported privilege under the Act. The Act provides in pertinent part:

> "All information, interviews, reports, statements, memoranda, recommendations,
> letters of reference or other third party confidential assessments of a health care
> practitioner's professional competence, or other data of *** committees of
> licensed or accredited hospitals or their medical staffs, including Patient Care
> Audit Committees, Medical Care Evaluation Committees, Utilization Review
> Committees, Credential Committees and Executive Committees, or their
> designees (but not the medical records pertaining to the patient), used in the
> course of internal quality control or of medical study for the purpose of reducing
> morbidity or mortality, or for improving patient care *** shall be privileged,
> strictly confidential and shall be used only for medical research, increasing organ
> and tissue donation, the evaluation and improvement of quality care, or granting,
> limiting or revoking staff privileges or agreements for services ***." 735 ILCS
> 5/8-2101 (West 2016).

¶ 21    Section 8-2102 of the Act provides that such privileged material "shall not be admissible as evidence, nor discoverable in any action of any kind in any court." *Id.* § 8-2102. The purpose of the Act is to "encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." *Niven v. Siqueira*, 109 Ill. 2d 357, 366 (1985). The Act is premised on the belief that, absent the privilege, physicians might be reluctant to sit on peer review committees and engage in frank evaluations of their colleagues. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 40 (1993).

¶ 22    However, the Act was "never intended to shield hospitals from potential liability." *Anderson v. Rush-Copley Medical Center, Inc.*, 385 Ill. App. 3d 167, 174 (2008). " '[N]ot every piece of information a hospital staff acquires is nondiscoverable, even if it is acquired by a peer-review committee.' " *Frigo v. Silver Cross Hospital & Medical Center*, 377 Ill. App. 3d 43, 65 (2007) (quoting *Giangiulio v. Ingalls Memorial Hospital*, 365 Ill. App. 3d 823, 835 (2006)). The Act protects documents that arise from the workings of a peer review committee, "which are an integral part, but not the result, of the peer-review process." *Toth v. Jensen*, 272 Ill. App. 3d 382, 385 (1995). Information generated prior to the commencement of the peer review process but later disclosed to a peer review committee is not privileged under the Act. *Grandi v. Shah*, 261 Ill. App. 3d 551, 556 (1994). The Act "protects against disclosure of the mechanisms of the peer-review process, including information gathering and deliberations leading to the ultimate decision rendered by a peer-review committee, but does not protect against the discovery of information generated before the peer-review process begins or information generated after the peer-review process ends." *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 549 (2004).

¶ 23    The burden of establishing a privilege under the Act is on the party seeking to invoke it, which is NCH in this case. *Ardisana v. Northwest Community Hospital, Inc.*, 342 Ill. App. 3d 741, 746 (2003). This burden may be met by submitting the materials alleged to be privileged for an *in camera* inspection, or by submitting affidavits setting forth facts sufficient to establish the applicability of the privilege to the particular documents being withheld. *Ekstrom v. Temple*, 197 Ill. App. 3d 120, 127 (1990). Whether a discovery privilege applies is a matter of law, subject to *de novo* review. *Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.*, 347 Ill. App. 3d 817, 825 (2004). However, "whether specific materials are part of an internal quality control or a medical study is a factual determination, which will not be reversed on review unless it is against the manifest weight of the evidence." *Anderson*, 385 Ill. App. 3d at 174.

¶ 24    In the case at bar, NCH submitted several affidavits. NCH also submitted the documents in question for *in camera* inspection by the trial court. Upon review of the submitted affidavits and the documents in question, which were filed under seal, we find that NCH met its burden of proof to establish the applicability of the medical studies privilege to the documents in question. We will now discuss each of those documents in turn.

¶ 25                    Quality Management Worksheets

¶ 26    The first two documents at issue (Document Nos. 1 and 2) are titled: "Quality Management Worksheet, Confidential Peer Review Information, Anesthesia and Pain," and "Quality Management Worksheet, Confidential Peer Review, Obstetrics/Gynecology." This court examined similar documents under seal in *Ardisana*, a case that also involved NCH, and found that a quality management worksheet prepared for the surgical audit committee and a quality management worksheet prepared for the anesthesia department quality audit committee, both constituted privileged documents under the Act. *Ardisana*, 342 Ill. App. 3d at 748.

11

Specifically, this court found that "each of the documents establishes, by its own content, that it served an integral function in the peer-review information-gathering and decision-making process." *Id.* The court found that it was clear from the quality management/improvement worksheets' content that "they were authored for the use of a peer-review committee and are thus entitled to protection from disclosure." *Id.* at 749. In making its decision, this court noted that NCH had provided the affidavit of its risk manager, which stated that the documents in question were generated in the process of investigations by the general surgery quality improvement audit and anesthesia quality improvement committees, were prepared solely for those two committees, and were used exclusively by those two committees. *Id.* at 748. The court noted that "[w]hen the facts within an affidavit are not contradicted with a counteraffidavit, they must be taken as true." *Id.*

¶ 27    Similarly here, we have reviewed the two quality control worksheets and the accompanying affidavits of Ferguson, who authored the first document, and Viggiano, who authored the second document. We conclude that these two worksheets served an integral function in the peer review information-gathering and decision-making process.

¶ 28    According to Ferguson's affidavit, the quality improvement resource specialist at the time, the Anesthesia Quality Improvement Audit Committee is the peer review committee specific to the Department of Anesthesia, and it provides a mechanism for monitoring and evaluating the quality and appropriateness of patient care. Ferguson stated that she was familiar with certain peer review activities that took place as a result of the care of the decedent and that a Department of Anesthesia peer review began shortly after the death of decedent on May 28, 2015. Ferguson stated that the peer review was triggered by decedent's death as meeting one of the "established indicators for review by the Anesthesia Quality Improvement Audit

12

Committee." Ferguson stated that the document in question was "prepared by me at the direction of and for the exclusive use of the Anesthesia Quality Improvement Audit Committee."

¶ 29    Viggiano, a quality improvement resource specialist at NCH, stated in her affidavit that she authored the second document in the amended privilege log, titled "Quality Management Worksheet, Confidential Peer Review, Obstetrics/Gynecology." She stated that the OB/GYN Quality Improvement Audit Committee is the peer review committee specific to the Department of Obstetrics and Gynecology. The committee also directs and empowers one or more individuals to assemble information about the patient care events. Viggiano stated that she assembles information and prepares data at the direction and for the use of the committee through the creation of quality management worksheets. Viaggiano stated that the peer review was triggered by the decedent's death as meeting one of the established indicators for review by the committee.

¶ 30    We find, based on the information contained in these affidavits, and on our own review of the first two documents on NCH's amended privilege log, that NCH has met its burden of proof to show that the quality management worksheets were authored for the use of peer-review committees and are thus entitled to protection from disclosure. See *id.* at 749.

¶ 31                     Joint Commission Documents

¶ 32    The next documents at issue in NCH's amended privilege log that we will discuss are the joint commission documents (Document Nos. 10, 11, 18, and 24). Document No. 10 is titled "Sentinel Event Measures of Success Draft Report," Document No. 11 is titled "Sentinel Event Measures of Success Summary Report," Document No. 18 is titled "Organization Self Report to the Joint Commission," and Document No. 24 is titled, "Summary Report to the Joint Commission for Sentinel Event Number 224628."

13

¶ 33     In support of its claim of privilege, NCH submitted the affidavit of Ronayne, the executive director of service excellence of NCH. Ronayne stated that the Department of Service Excellence is the quality department of NCH which is responsible for overseeing and implementing activities of the hospital relating to quality improvement, peer review, patient safety, and accreditation and certification. Ronayne stated that her predecessor was Tricia Elliott, who held the position during the incident in question. Ronayne stated that she was familiar with the file maintained by the Department of Service Excellence, which concerns the investigation of the care rendered to the decedent. Ronayne stated that NCH is accredited by the Joint Commission. Ronayne noted in her affidavit that the Joint Commission adopted a sentinel event policy in 1996 to help hospitals that experience serious adverse events improve safety and learn from those sentinel events. The purpose of reporting a sentinel event to the Joint Commission is to prevent similar patient safety events in the future and to improve the quality of care. Ronayne averred that the reporting of an event to the Joint Commission by NCH is within the scope of the Quality and Patient Safety Committee. Ronayne stated that she was familiar with the report made to the Joint Commission by Elliott. Ronayne indicated that Document Nos. 10, 11, 18, and 24 were generated by Elliott pursuant to the authority granted to her and her staff by the Quality and Patient Safety Committee. Ronayne stated: "Document 18 is the initial report made to The Joint Commission on May 15, 2015; Document 24 is the Summary Report to the Joint Commission; Document 10 is a draft of Ms. Elliott's summary report to the Joint Commission; and Document 11 is a follow up Summary Report to The Joint Commission."

¶ 34     After reading Ronayne's affidavit and reviewing the sealed documents in question, we find that they are not discoverable. In *Niven*, 109 Ill. 2d at 362, our supreme court addressed the issue of whether the Joint Commission had to produce certain documents including, " 'all other

documents, records and other papers and instruments of writing regarding or relating to Northwestern Memorial Hospital.' " Northwestern Memorial Hospital and the Joint Commission objected on the basis of the Act. Our supreme court noted that the purpose of the Act is to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease. *Id.* at 366. Our supreme court found that "allied medical societies" listed in the Act can "only refer to those medical societies which are closely related to the purposes of the Act, *i.e.*, those medical societies that engage in studies or programs designed to further the purposes of the Act." *Id.* Our supreme court found that a common understanding of the term "medical society" would "certainly include the Joint Commission, which is, as its name implies, a joint undertaking of several established medical societies." *Id.* at 366-67. The court found that the materials sought by the plaintiffs were gathered "as part of a program designed to improve quality control and patient care" and that therefore "the materials fall under the protection of the Act." *Id.* at 367.

¶ 35    Likewise in the case at bar, we find that these Joint Commission documents are protected under the Act because "the legislature intended the disclosure of confidential materials to the Joint Commission to be an activity protected by the confidentiality guarantees of section 8-2101 [of the Act]." *Id.* at 367-68.

¶ 36                    Root Cause Analysis Documents

¶ 37    The final group of documents at issue are the root cause analysis documents, which include Document Nos. 12 through 16, which are titled, "Root Cause Analysis Framework," Document No. 17, titled "Patient Safety Event Debriefing Meeting Notes Pursuant to Root Cause Analysis Investigation," and Document Nos. 19 through 23, titled, "Meeting Notes Pursuant to Root Cause Analysis Investigation." Ronayne stated in her affidavit that she and other members

of the Department of Service Excellence are responsible for conducting root cause analysis investigations of specific patient cases in order to investigate opportunities for quality improvement, to identify patient safety issues, and to make recommendations for further improvement based on the findings. Ronayne explained that a root cause analysis identifies causal factors of the adverse outcome or variation in care and why they occurred, focusing primarily on systems and processes. By identifying the root cause of an adverse event, patient care is improved and recurrence is eliminated or mitigated. Ronayne stated that pursuant to NCH's quality improvement process, the decedent's care was identified as an event which necessitated a root cause analysis and Dr. Loren, chief medical officer and as a member of the Quality and Patient Safety Committee, authorized Elliott and her department to initiate a root cause analysis investigation, which began on May 14, 2015, a day after the decedent's surgery. Ronayne stated that Elliott and another member of her department, Bridget Bucholz, were designated gather information regarding the incident and conduct a root cause analysis investigation. Ronayne stated that Document Nos. 17, 19, 20, 21, 22, and 23 are the notes that Bridget Bucholz took during meetings she conducted pursuant to this investigation on May 14, May 18, May 19, May 20, and June 10, 2015. A review of these sealed documents reveals that those are indeed her notes from those meetings. Ronayne stated that Document Nos. 12-16 were generated by Bucholz to detail the investigation, deliberations, analysis, and conclusions of the root cause analysis investigation. A review of those sealed documents reveals the same. Ronayne stated that the root cause analysis investigation and meetings were performed in the course of internal quality control as part of NCH's quality improvement process.

¶ 38     Dr. Loren, the chief medical officer of NCH, stated in his affidavit that he was a member of the Quality Committee of the Board of Directors of NCH at the time of the incident, as well as

16

a member of the Quality and Patient Safety Committee of NCH. Dr. Loren stated that he was authorized to direct the performance of root cause analysis investigations of patient care, which are done for the purpose of improving the quality of patient care and reducing the risk of similar events occurring in the future. Dr. Loren stated that on May 14, 2015, he was advised of the occurrence with decedent. Attached to his affidavit was a memo dated May 14, 2015, directing Elliot and her department to perform a full root cause analysis investigation into the event that occurred involving the decedent.

¶ 39    The express language of the Act states that a privilege applies to

"[a]ll information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs ***, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care ***." 735 ILCS 5/8-2101 (West 2014).

The purpose of the Act "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Roach*, 157 Ill. 2d at 40. Here, we find that these root cause analysis documents fall squarely within the express language of the Act and the purpose of the Act, as the documents were generated by designees of the Quality and Patient Safety Committee in the course of internal quality control for the purpose of reducing morbidity or mortality or for improving patient care.

¶ 40                          Trial Court's Concerns

¶ 41    We briefly address the trial court's comments that were made during the hearings on this issue of the privilege log. During the January 20, 2017, hearing the trial court stated, "I'm talking not about the actual piece of paper, but the information that's contained therein, which, obviously, in my opinion was created before the peer review occurred." According to Viggiano and Ferguson, the peer review began shortly after the decedent's death on May 28, 2015. Our review of the sealed documents does not reveal any peer review documents that were generated before May 28, 2015. There are, however, root cause analysis investigation documents that were generated before that date. Ronayne stated in her affidavit that the root cause analysis investigation began on May 14, 2015, a day after the decedent's surgery. Dr. Loren similarly stated in his affidavit that he was advised on May 14, 2015 of an occurrence on May 13, 2015, involving decedent's care and that he ordered the root cause analysis investigation. Accordingly, there are certainly documents in the privilege log that were generated before the peer review process began, however, as discussed above, those documents are privileged, as they fall squarely within the purview of the Act where they were generated by designees of the Quality and Patient Safety Committee in the course of internal quality control for the purpose of reducing morbidity or mortality or for improving patient care. 735 ILCS 5/8-2101 (West 2014).

¶ 42    Also during the January 20, 2017, hearing the trial court stated it

    "wanted to be sure that what defendants are not doing in these cases is taking information that is in a medical record, generating some piece of paper and giving it to the peer review and then not disclosing the information to the plaintiff saying we have a privilege, and we used this information and you can't have it."

It also stated, "my concern is, and I think I articulated it before, is that if the information that is in the medical records is missing, observations, discussions between medical personnel, that was

18

only disclosed in the peer review, then the plaintiff can't even begin to ask those questions. That's a problem." The court further stated,

> "if medical records don't contain information that somehow somebody then went to the peer review and disclosed, that information was not generated in my opinion for purposes of the peer review, and that is what is being hidden from the plaintiff, and that is not what the case law sustains."

¶ 43     We believe that through these statements the trial court was attempting to express the same concerns expressed in *Roach*—that simple act of furnishing a peer review committee with earlier-acquired information would not be sufficient to cloak that information with the statutory privilege, otherwise a hospital would be able to effectively insulate from disclosure virtually all adverse facts known to its medical staff, except for those matters actually contained in the patient's medical records. *Roach*, 157 Ill. 2d at 41-42. However, after careful examination of the affidavits and their accompanying exhibits, as well as the sealed documents themselves, there is nothing to suggest that NCH furnished a peer review committee with earlier-acquired information in order to hide that information. Rather, it is evident that an internal investigation was launched by peer review committees after the decedent's surgery because the incident met certain triggering criteria. The documents in question fall squarely within the Act's description of privileged documents, which include

> "[a]ll information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs ***, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical

study for the purpose of reducing morbidity or mortality, or for improving patient care." 735 ILCS 5/8-2101 (West 2014).

¶ 44 Moreover, we note that plaintiff has received the decedent's medical records and that "not only do medical malpractice plaintiffs have full and complete access to their own records, but they can also depose all persons involved in their treatment and engage experts to give opinions as to the quality of care received. Therefore, the denial of this information to such plaintiffs should have little impact on their ability to maintain their cause of action." *Jenkins v. Wu*, 102 Ill. 2d 468, 479 (1984).

¶ 45 As a final matter, we note that the "results" of the peer review process are not privileged. See *Ardisana*, 342 Ill. App. 3d at 747. Results of a peer review committee "take the form of ultimate decisions made or actions taken by that committee, or the hospital, and include the revocation, modification or restriction of privileges, letters of resignation or withdrawal, and the revision of rules, regulations, policies and procedures for medical staff." *Id.* "The recommendations and internal conclusions of peer-review committees, which may or may not lead to those results, *are not discoverable*." (Emphasis in original.) *Id.* The only issue before us is whether certain documents in the privilege log are privileged under the Act, and we have determined that they are privileged. Any further inquiries into peer review results, names of committee members, or other matters pertaining to this cause of action, we presume will take place on remand.

¶ 46                                    CONCLUSION

¶ 47 For the foregoing reasons, we reverse the trial court's discovery order, vacate the contempt order, and remand for further proceedings.

¶ 48 Reversed in part and vacated in part.

¶ 49    Cause remanded.