FIRST DIVISION

March 29, 2004

No. 1-03-0936

YOLANDA WEBB, as Special Administrator of the Estate of Ashley Webb, a minor, Deceased,

Plaintiff-Appellee,

v.

MOUNT SINAI HOSPITAL AND MEDICAL CENTER OF CHICAGO, INC., and KEITH WILLIAMS,

Defendants-Appellants.

)))

))))))))

)

)

Appeal from the Circuit Court of Cook County

00 L 8586

Honorable 

Randye A. Kogan, 

Judge Presiding

JUSTICE McBRIDE delivered the opinion of the court:

In this case we consider the propriety of the trial court's determination that documents withheld from discovery by defendants were not privileged under that part of the Code of Civil Procedure commonly known as the Medical Studies Act (735 ILCS 5/8-2101 
et seq.
 (West 2000))(the Act).  In response to plaintiff's discovery requests, defendants claimed that certain documents were privileged because they were part of an internal peer-review conducted by the Risk Management Committee at Mount Sinai Hospital and Medical Center of Chicago, Inc. (Mt. Sinai).  After an 
in camera
 review of the documents and consideration of the affidavits, briefs, and arguments offered by the parties, the trial court found that the documents were not privileged and ordered that defendants produce them.  Defendants asked the trial court to reconsider its decision.  The trial court denied that motion and found defendants in contempt of court for their failure to produce the documents.  The trial court additionally fined defendants $50.  Payment of the fine was stayed pending disposition of appeal. 

On July 28, 2000, plaintiff filed a complaint against defendants, two additional doctors, and another medical facility, seeking damages under the Illinois Wrongful Death Act (740 ILCS 180/0.01 
et seq.
 (West 2000)) and the Illinois Survival Act (755 ILCS 5/27-6 (West 2000)).  The complaint alleged that Ashley Webb was admitted to Mt. Sinai on July 28, 1998, "as an in-patient to rule out hepatitis and treatment for dehydration."  Williams was one of her treating physicians.  Ashley Webb died at Mt. Sinai on July 29, 1998.  The complaint alleged her death was due to defendants' negligence.  The case was removed to the federal district court, where the claims against all defendants except Mt. Sinai and Williams were dismissed.  Finding that it lacked jurisdiction over the claims, the district court remanded the case to the circuit court.     

During discovery, plaintiff served interrogatories and requests to produce on defendants.  In response to several inquiries, defendants explained that they possessed certain documents responsive to the requests but that those documents were privileged under the Act.  The documents at issue in this appeal are a "Patient Safety Digest Professional Peer Review Occurrence Summary" (Occurrence Summary) authored by Lori Notowitz, R.N., M.J., the former director of risk management at Mt. Sinai, and four memoranda "from" Notowitz "to" the Risk Management Committee (collectively the memoranda).  The memoranda summarized her interviews with four doctors, including Williams.  Two of the memoranda were dated August 4, 1998.  The other two were dated July 29, 1998.  

Upon receiving defendants' objections, plaintiff filed a "Motion for Ruling on Defendants' Medical Studies and Work Product Objections," requesting 
in camera
 review of the documents.  Rather than immediately offering the documents for 
in camera
 review, defendants offered the affidavit of Notowitz.  According to the affidavit, in July and August 1998, Notowitz was the director of risk management for Mt. Sinai.  Part of her duties was "to improve patient care and safety" at Mt. Sinai "through risk management techniques, which included, among other things, [her] participation in peer review committees."  She was also responsible "for loss prevention and managing claims" and was "in the decision-making chain in settling claims against" Mt. Sinai.  She was also a member of the Risk Management Committee, which "was a peer review committee composed largely of physicians, including the President of the Medical Staff."  The purpose of the committee "was to review patient care incidents and related systems issues in an effort to improve patient safety, the quality of patient care, and to reduce morbidity and mortality."  Notowitz prepared the documents at issue in this case and interviewed the various doctors mentioned in those documents "at the specific direction of the Risk Management Committee *** only after that Committee had received a report of Ashley Webb's death less than 24 hours after her admission to the Hospital and after that Committee had undertaken a formal review of that occurrence."  The documents were "utilized solely for the purposes of the investigation of the Risk Management Committee ***.  They were presented solely to the Risk Management Committee ***.  They were utilized solely for peer review, patient safety, and quality improvement purposes."  They were kept separate from any litigation files and were not shared with Mt. Sinai's attorneys.  

In reply, plaintiff claimed that defendants' affidavit was insufficient to show that the privilege applied.  Specifically, plaintiff complained that the evidence failed to show "when the 'peer review' or 'quality improvement committee' first met to begin investigating Ashley Webb's death."  The trial court ordered defendants to file supplemental affidavits and provide the documents for 
in camera
 review.  

Notowitz's second affidavit added that "[p]atient care incidents requiring review by the Risk [M]anagement Committee were brought to the attention of the Committee by a variety of sources, including individual Committee members and department peer review committees" and that "where an event occurred between scheduled meetings of the Risk Management Committee, the Chairman of that committee had the authority to initiate an investigation and review of the occurrence" on behalf of the committee.  On July 29, 1998, after being notified of Ashley Webb's death, the Chairman of the Risk Management Committee instructed Notowitz "to initiate an investigation and review of the occurrence" on behalf of the committee.  The memoranda documenting Notowitz's interviews with doctors Perkins, Chaparro, Williams, and Ojo were prepared to "utilize in the preparation" of the Occurrence Summary.  "The memoranda themselves were not distributed to members of the Risk Management Committee.  In fact, they were shared with nobody."  Notowitz maintained minutes of all of the meetings of the Risk Management Committee, but she was unaware of what became of those minutes after she left Mt. Sinai and "relinquished control of them to [her] successor."  She did not recall the date of the meeting of the Risk Management Committee in which she discussed her findings and recommendations in relation to Ashley Webb.  She remembered, however, that a meeting had occurred.  

After reviewing the affidavits and the documents, the trial court concluded that the documents were not privileged under the Act.  The court explained:

"Inspection of the actual documents undoubtedly reveals that their purpose encompassed 'an effort to improve patient safety, the quality of patient care, and to reduce morbidity and mortality.'  However, this inspection also reveals that the processes of peer-review and quality improvement were not the sole purpose of their generation.  Each of the documents authored by Notowitz clearly anticipates litigation.  The Peer Review Occurrence Summary advises the Risk Management Committee that 'the risk of litigation is high.'  Each memo pertaining to an interview begins, 'You have asked me to review the care of Ashley Webb to identify 
any issues of liability
 or potential patient safety.'  Regardless as to whether these documents were ever used in a peer-review process, such statements indicate that they were, at least in part, created to render legal opinions or weigh potential liability risk.  Thus, since they were not generated specifically for peer-review, these documents are not protected by the privilege allowed by the Illinois Medical Studies Act."  (Emphasis added.)

Defendants filed a motion for reconsideration of the trial court's order.  Alternatively, defendants sought an amended order limiting production to redacted documents or a contempt order that would allow defendants to appeal the trial court's order.  

After plaintiff filed her response to defendants' motion for reconsideration, the trial court granted defendants' request for additional time to file a supplemental affidavit.  Specifically, the trial court instructed defendants that in order to reconsider its findings, the trial court sought information regarding Notowitz's use of the phrases "liability" and "litigation" in the documents and proof that "the peer review took place." 

In her third affidavit, Notowitz corrected a previous erroneous statement that the president of the medical staff was chairman of the Risk Management Committee and indicated that the chairman was the vice president of medical affairs at Mt. Sinai.  Notowitz explained that the only functions of the Risk Management Committee were "peer review and patient safety."  The committee "did not review or evaluate liability issues or exposure to possible future litigation" in this or any other case "because other Hospital committees were charged specifically with addressing those issues."  The committee had authorized its chairman to act on its behalf and "initiate investigation and review of an occurrence" when such an occurrence happened between regularly scheduled committee meetings.  On "7/28/98," Notowitz informed the chairman of Ashley Webb's death, and the chairman instructed her "to initiate an investigation and review of the occurrence" on behalf of the committee.  The full committee did not meet before Notowitz began her investigation.  

With regard to the references in the memoranda to issues of liability, Notowitz explained:

"Insofar as [the memoranda] contain introductory language suggesting that I was to review the care of Ashley Webb to identify 'any issues of liability,' that language was included at the specific instruction of Hospital counsel as being necessary to preserve the materials as privileged.  Notwithstanding that language, however, I did not conduct these interviews or prepare these memoranda or Exhibit A for the purpose of evaluating potential liability risk or weighing exposure in possible future litigation.  Nor did the Risk Management Committee review the care of Ashley Webb for the purpose of evaluating potential liability risk or weighing exposure in possible future litigation."  

At a hearing on October 17, 2002, defendants requested an evidentiary hearing on the motion to reconsider.  The trial court denied that request finding that defendants had indicated that they had provided the court with everything it needed.  The trial court, however, offered defendants the opportunity to bring Notowitz into court to give a sworn oral statement.  Defendants elected not to bring Notowitz into court because of the expense of doing so.

On February 26, 2003, the trial court denied defendants' motion for reconsideration.  The trial court found that the affidavits of Notowitz were "insufficient to establish that the documents she authored were privileged" under Act and emphasized  that "[d]efendants [had] been given ample opportunity to provide the information necessary for this Court to make the conclusion as a matter of law that the at-issue documents are privileged under the Medical Studies Act," but failed to do so.  Although finding defendants in contempt and imposing "a penalty of $50.00 upon them," the trial court did not find defendants' refusal to produce the documents "contemptuous."    

On appeal, defendants contend that the trial court's finding that the documents were not privileged under the Act was against the manifest weight of the evidence.  Defendants claim that the "uncontroverted affidavits of Lori Notowitz *** established that the documents at issue are *** protected."  Specifically, defendants claim that because the plaintiff did not "file any counteraffidavits or other evidentiary material controverting the well-alleged facts of Ms. Notowitz's affidavit that were based on her personal knowledge," we must accept the facts of Notowitz's affidavits as true.  Regardless of our disposition on the merits, defendants argue, the trial court's contempt order should be vacated because it was sought in good faith as a means of obtaining review of the trial court's discovery order.  

Plaintiff responds that the trial court's finding that the documents were not privileged and its order to produce the documents were proper.  Plaintiff first argues that Notowitz's affidavits are inconsistent and need not be accepted as true.  Plaintiff next claims that "the hospital did not produce any credible evidence to show that the hospital actually conducted a peer review."  Specifically, it points to Mt. Sinai's failures to produce the minutes of the committee meeting related to Ashley Webb's death and explain why it did not produce them.  Plaintiff contends that, based on the evidence, "we do not know when the purported review took place, i.e., when it began and when it ended, or even if one actually occurred."  Finally, plaintiff argues that the language from the documents, as identified in the trial court's order, "contravened the hospital's contention that these were specifically peer review documents."  Plaintiff discounts Notowitz's explanation of the litigation language in the memoranda by claiming that the "excuse implies that the hospital was, at least at that point, trying to create an attorney-client privilege, and that in turn further implies that Notowitz was engaged in a liability investigation, not a peer review investigation."  Plaintiff does not object to defendants' request that we vacate the contempt order entered against defendants.

Section 8-2101 of the Act provides, in relevant part:

"All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services ***."  735 ILCS 5/8-2101 (West 2002).

The Act further provides:

"Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person.  The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility."  735 ILCS 5/8-1202 (West 2002).

The Act's purpose "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care."  
Roach v. Springfield Clinic
, 157 Ill. 2d 29, 40 (1993).  The Act also serves "to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease."  
Niven v. Siqueira
, 109 Ill. 2d 357, 366 (1985).  The Act "was never intended to shield hospitals from potential liability" (
Roach
, 157 Ill. 2d at 42), and "legal advice is not a goal of the protection offered by the Act" (
Chicago Trust Co. v. Cook County Hospital
, 298 Ill. App. 3d 396, 404 (1998)).  

The Act does not protect "all information used for internal quality control" (
Grandi v. Shah
, 261 Ill. App. 3d 551, 557 (1994)); instead, documents "generated specifically for the use of a peer-review committee receive protection under the Act" (
Chicago Trust Co.
, 298 Ill. App. 3d at 402).  A document that "was initiated, created, prepared, or generated by a peer-review committee" is privileged under the Act, "even though it was later disseminated outside the peer-review process."  
Chicago Trust Co.
, 298 Ill. App. 3d at 406.  The reverse is not true, however.  A document created "in the ordinary course of the hospital's medical business, or for the purpose of rendering legal opinions or to weigh potential liability risk or for later corrective action by the hospital staff" is not privileged "even though it later was used by a committee in the peer-review process."  
Chicago Trust Co.
, 298 Ill. App. 3d at 406.  Our supreme court explained:

"If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records.  As a result, it would be substantially more difficult for patients to hold hospitals responsible for their wrongdoing through medical malpractice litigation.  So protected, those institutions would have scant incentive for advancing the goal of improved patient care.  The purpose of the act would be completely subverted."  
Roach
, 157 Ill. 2d at 41-42.

Similarly, the Act does not "protect against disclosure of information generated before a peer-review process begins or after it ends."  
Ardisana v. Northwest Community Hospital, Inc.
, 342 Ill. App. 3d 741, 748 (2003).  Thus, the hospital committee "must be engaged in the peer-review process before the statutory privilege is applicable."  
Grandi
, 261 Ill. App. 3d at 557.

The question of whether the Act's privilege applies is a question of law that is reviewed 
de novo
; however, the question of whether specific materials are part of an internal quality control "is a factual question," on which defendants bear the burden.  
Berry v. West Suburban Hospital Medical Center
, 338 Ill. App. 3d 49, 53-54 (2003).  Similarly, defendants bear the burden of any "failure to make a more complete record."  
Grandi
, 261 Ill. App. 3d at 557.  The trial court's factual determination of whether the documents at issue were part of an internal quality control will not be reversed "unless it is against the manifest weight of the evidence."  
Berry
, 338 Ill. App. 3d at 54. 

A decision is against the manifest weight of the evidence "if it is wholly unwarranted by the evidence" (
Schleyhahn v. Cole
, 178 Ill. App. 3d 111, 117 (1989)), if "an opposite conclusion is apparent or *** the trial court's findings appear to be unreasonable, arbitrary, or not based upon the evidence" (
Freese v. Buoy
, 217 Ill. App. 3d 234, 244 (1991)), or if "it is clearly evident that the conclusion opposite to the one reached by the trial court was the proper disposition" (
Crawford County State Bank v. Marine American National Bank
, 199 Ill. App. 3d 236, 256 (1990)).  In evaluating the evidence in this case, we recognize that when the facts in an affidavit are uncontradicted, "they must be taken as true notwithstanding the existence of contrary unsupported allegations."  
Flannery v. Lin
, 176 Ill. App. 3d 652, 658 (1988).  However, a counteraffidavit is not the only means by which an affidavit can be contradicted; an affidavit may be contradicted by other documentary evidence.  See, 
e.g.
, 
Rumford v. Countrywide Funding Corp.
, 287 Ill. App. 3d 330, 336 (1997)(finding that a moving party is not entitled to summary judgment based on the opposing party's failure to file a counteraffidavit where the moving party's affidavit is contradicted by documents attached to the complaint).   Where there are conflicts or contradictions in the evidence, the trial judge "is in a better position than is the appellate court to weigh the evidence and ascertain the credibility of the witnesses."  
Crawford County State Bank
, 199 Ill. App. 3d at 256; see also 
Susan E. Loggans & Associates v. Estate of Magid
, 226 Ill. App. 3d 147, 154 (1992).  

After our review of Notowitz's three affidavits and the documents at issue in this appeal, which were provided to us under seal, we do not find that Notowitz's affidavits are completely uncontradicted, as defendants argue.  Instead, we find significant discrepancies in the evidence.  In the first affidavit, for instance, Notowitz explained that the four memoranda were "presented solely to the Risk Management Committee."  Yet, in her second affidavit, she claims that "[t]he memoranda themselves were not distributed to members of the Risk Management Committee."  Moreover, Notowitz explained the purpose of the Risk Management Committee as reviewing patient care incidences "in an effort to improve patient safety, the quality of patient care, and to reduce morbidity and mortality."  Yet, the documents contradict this assertion.  Specifically, the memoranda include statements that each was prepared at the request of the Risk Management Committee, in part, "to identify any issues of liability."  Similarly, the Occurrence Summary concludes that "the risk of litigation is high."  It was not until after the trial court ruled that the documents were not privileged under the Act because of this language that Notowitz attempted to explain the statements.  It was not unreasonable for the trial court to give more credit to the statements made in the documents and contemporaneously with the events at issue in this case than to the statements made more than four years later after the trial court ruled that the earlier statements rendered the documents unprivileged.  Moreover, the trial court's finding was not inconsistent with the evidence, which explained that as a part of her duties at Mt. Sinai, Notowitz was responsible "for loss prevention and managing claims" and was "in the decision-making chain in settling claims against" Mt. Sinai.     

Contrary to defendants' claim, 
Flannery v. Lin
, 176 Ill. App. 3d 652 (1988),
 
was not a case where a "far weaker factual showing [than presented in this case] was found sufficient" to establish that the privilege applied.  In that case, the court found that a "code blue evaluation report" was privileged because "the record adequately demonstrate[d] that the code blue evaluation report was part of the hospital's internal quality control."  
Flannery
, 176 Ill. App. 3d at 657.  The defendant supported its claim of privilege with the affidavits of its director of quality management and manager of medical records.  Both affidavits described the code blue evaluation report as a part of the hospital's quality control review.  
Flannery
, 176 Ill. App. 3d at 654-55.  The court's finding that the documents were privileged was based upon the facts contained in those affidavits, both of which were uncontradicted.  
Flannery
, 176 Ill. App. 3d at 655, 658.  As noted above, that was not case here where Notowitz's affidavits were internally inconsistent and contradicted by the documentary evidence.  

Furthermore, as the trial court pointed out in this case, there is no indication in the record as to when the Risk Management Committee's review occurred.  While Notowitz claims that her interviews occurred "after that Committee had undertaken a formal review of that occurrence," there is no evidence showing that all the memoranda and the occurrence report were completed prior to the close of the committee's review.  Moreover, in her third affidavit, Notowitz claimed that she informed the chairman of the Risk Management Committee of Ashley Webb's death and initiated the investigation and review of that occurrence on "7/28/99," a date which conflicts with the one given in her earlier affidavits and appears to be the day before Ashley Webb died.  As noted above, the timing of the peer review is a crucial fact because the Act does not protect documents generated before the peer-review process begins or after it ends.  See 
Ardisana
, 342 Ill. App. 3d at 748.  Without this evidence and in light of the specific words contained in the documents, it was not unreasonable for the trial court to conclude that defendants failed to show that the documents were part of the Risk Management Committee's peer-review process. 

Based on all the evidence, it is not apparent that an opposite conclusion was warranted.  Nor are we convinced that the trial court's decision was unreasonable, arbitrary, or contrary to the evidence.  The trial court's decision was not against the manifest weight of the evidence, and we affirm the trial court's order that the documents be produced.  This, however, does not mean that we must affirm the finding of contempt against defendants.  

It is appropriate for a party to request that a contempt order be entered against it so that party may seek immediate appeal of a trial court's discovery order.  
Berry
, 338 Ill. App. 3d at 57.  In such situations, where the party sought the order in good faith and was not contemptuous of the trial court's authority, we may vacate the contempt order even when we find that the trial court's discovery order was proper.  
Berry
, 338 Ill. App. 3d at 57.  In this case, the trial court found that defendants' actions were not contemptuous.  Defendants appropriately sought review of a discovery order requiring them to produce documents which they reasonably contended were privileged.  Accordingly, we vacate the contempt order entered against defendants.

Affirmed in part, vacated in part.

O'MALLEY, P.J., and GORDON, J., concur.