2020 IL App (1st) 190099-U

No. 1-19-0099

Fourth Division
January 16, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | |
|---|---|
| SAM BECCARA, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | |
| ) | |
| DIALYSIS CENTERS OF AMERICA-ILLINOIS, INC. ) | Appeal from the Circuit Court |
| d/b/a Fresenius Medical Care Mokena, a/k/a ) | of Cook County. |
| Fresenius Kidney Care Mokena; VALUE INDUSTRIAL ) | |
| PARTNERS, LLC; VIP MDG, LLC; and ARAMARK ) | No. 17 L 002882 |
| UNIFORM SERVICES (MIDWEST) LLC, ) | |
| ) | The Honorable |
| Defendants ) | Moira Johnson, |
| ) | Judge Presiding. |
| (Dialysis Centers of America-Illinois, Inc. d/b/a ) | |
| Fresenius Medical Care Mokena, a/k/a Fresenius Kidney ) | |
| Care Mokena, ) | |
| Defendant-Appellant, ) | |
| ) | |
| Anthony J. Longo, ) | |
| Contemnor-Appellant). ) | |
| ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:*    (1) The trial court's order requiring production of an "Adverse Event Report" was not against the manifest weight of the evidence, where the trial court properly found that the document was not shielded by the Medical Studies Act (735 ILCS 5/8-2101 (West 2016)). (2) The trial court's order requiring production of a "Notice of Potential Professional General Liability Claim Form" was proper, where defendant failed to establish that the form was transmitted to the insurance company.

¶ 2    The instant interlocutory appeal concerns the question of whether two documents should have been produced in discovery in the course of litigation concerning plaintiff Sam Beccara's fall in the entryway of the offices of defendant, Dialysis Centers of America-Illinois. Defendant claimed that they are privileged and, after the trial court ordered defendant to produce the documents, defendant refused. The trial court entered a friendly contempt order and imposed a $100 fine to permit appellate review and, for the reasons that follow, we affirm the trial court's order for the production of the documents and vacate the contempt finding.

¶ 3                                    BACKGROUND

¶ 4    On March 20, 2017, plaintiff filed a complaint[1] in which he alleged that defendant owed a kidney dialysis center in Mokena, Illinois, which plaintiff visited for dialysis on March 15, 2017. A rug had been placed on the ground in the entryway to the center by defendant's employees, but the rug was not laid flat on the floor, which caused plaintiff to fall as he walked over the rug. Plaintiff alleged that defendant's negligence caused plaintiff "injuries of a personal and pecuniary nature."

¶ 5    The parties engaged in discovery, during the course of which plaintiff issued a number of written discovery requests.[2] Defendant objected to several interrogatories and requests to produce, leading plaintiff to file a motion to compel on March 2, 2018. Specifically, as relevant

---

[1] The complaint was amended three times, but the relevant allegations remained the same as in the original complaint.

[2] The primary documents at issue on appeal were filed under seal. Consequently, we discuss only the details necessary for resolution of the issues on appeal.

to the instant appeal, in response to an interrogatory asking if there were any privileged documents that would not be produced, defendant responded that "[f]ollowing the incident, an Adverse Event Report was created pursuant to the auspices of the Illinois Medical Studies Act [(735 ILCS 5/8-2101 (West 2016))]. As such, the document is privileged and will not be produced in this litigation." Defendant also produced a privilege log listing the adverse event report as privileged under the Medical Studies Act. In the motion to compel, plaintiff argued that, even assuming that dialysis centers were covered by the Medical Studies Act, the report was not privileged because it did not fall within the scope of the Medical Studies Act.

¶ 6       In response to the motion to compel, as relevant to the instant appeal, defendant claimed that the adverse event report was sent to defendant's quality assessment improvement (QAI) committee and was privileged under the Medical Studies Act because the report was generated as part of the peer review process for the purpose of improving the quality of patient care at the center. On April 6, 2018, the trial court ordered defendant to respond to several of plaintiff's discovery requests, and also reserved ruling on the applicability of the Medical Studies Act, inviting the parties to submit additional briefing on the issue.

¶ 7       Defendant filed a surresponse to plaintiff's motion to compel, again arguing that the adverse event report was privileged under the Medical Studies Act. Attached to the surresponse was an April 30, 2018, affidavit from Ritchie Quinones, in which he averred that he was the clinical manager at the dialysis center and that, in that capacity, he was familiar with the peer review activities that were undertaken with regard to the care and treatment rendered to plaintiff at the center. Quinones averred that the adverse event report "was created by Mary Tamayo, R.N. as a delegate of the dialysis clinic's QAI (Quality Assessment Improvement) Committee as part of the peer review that was undertaken by me and the QAI Committee with

regard to the care and treatment rendered to [plaintiff] at [the dialysis center] on March 15, 2017." Quinones averred that the peer review investigation was conducted due to plaintiff's "fall event" and that "[p]eer review was initiated immediately after this specific incident occurred" on March 15, 2017. Quinones averred that the information contained in the adverse event report was gathered through the peer review investigation, including "interviews of the relevant personnel conducted by Nurse Tamayo as a delegate of the QAI Committee." Quinones averred that adverse event reports were maintained by the clinic manager and the QAI committee and that they "are used in the course of internal quality control, for medical study for the purpose of reducing morbidity or mortality, and for improving the quality of patient care at [the dialysis center]." Quinones also averred that the documents were intended to be confidential and are used by the QAI committee "to assure quality in patient care and internal quality control." Finally, Quinones averred that, in his capacity as clinical manager, he was "also aware that [his] employer contracts with health insurance providers and other health care entities or facilities in order to provide care and benefits to our patients."

¶ 8        In his surreply in support of his motion to compel, plaintiff argued that the Medical Studies Act did not apply to dialysis centers and, even if it did, the adverse event report would not fall within the scope of the privilege. Attached to the surreply was the transcript of the discovery deposition of Quinones, in which he testified that he is a registered nurse and is employed by defendant as the clinical manager of the dialysis center at which plaintiff fell. Quinones testified that, in March 2017, the dialysis center employed two nurses, five patient care technicians, a dietician, a social worker, and a secretary, in addition to Quinones as the clinical manager; the center did not employ any physicians. Quinones testified that between 7 and 8 p.m. on the evening of plaintiff's fall, Tamayo, the nurse on duty, called Quinones at home to

4

inform him of a "fall incident." Tamayo did not give him any details, but Quinones "told them to start doing the peer review of the incident." Quinones testified that Tamayo informed him that plaintiff had fallen on his way into the center and that he had not yet received any patient care at the time of the fall. Quinones testified that he instructed Tamayo to gather information and document it in an adverse event report "[b]ecause that's how we do our peer review. The first thing is [to] collect the data." The next day, Quinones contacted the "peer team," which included the QAI committee, to inform them of the fall; Quinones contacted defendant's medical director, defendant's director of operation, the regional vice-president, the clinical quality manager, and an individual with the clinical services department whose name he could not recall. Quinones testified that the only member of the QAI committee who was a physician was the medical director. The adverse event report was discussed at the next QAI committee meeting, which was in April.

¶ 9        Quinones also testified that there was a different report that was sent to the health, safety, and risk management department; Quinones filled out that form personally. Plaintiff's counsel asked defendant's counsel if the report had been produced in discovery, and defendant's counsel responded that the document was a "Notice of Potential Professional General Liability Claim Form" (the claim form) that was sent to the insurance company; defendant's counsel indicated that defendant's privilege log would be amended to include the claim form, which defense counsel had only received the prior week.

¶ 10        When asked about his statement in his affidavit concerning contracts with health insurance providers and facilities, Quinones testified that "we have contracted with our doctors and our facility. We have contracted with other companies, like the laboratories."

¶ 11    After Quinones' deposition, defendant filed amended responses to plaintiff's requests to produce, adding the claim form as a privileged document based on the insurer-insured privilege and attaching an amended privilege log that included the claim form.

¶ 12    On August 17, 2018, plaintiff filed an amended motion to compel, seeking production of the adverse event report and the claim form. With respect to the claim form, as relevant to the instant appeal, plaintiff argued that the insurer-insured privilege did not apply because the document was not a communication to an insurer. Instead, Quinones had testified that he prepared the form and submitted it to defendant's corporate health, safety, and risk management department.

¶ 13    On August 23, 2018, after reviewing both forms *in camera*, the trial court entered an order requiring defendant to produce the adverse event report, finding that the report was not privileged under the Medical Studies Act. The court found that the report "is merely an incident report. The fact that the person who is the witness claims that he told the nurse to make a report, which was merely a business report done in the ordinary course of business and decide[s] to say that at that point, a peer review process has begun doesn't change the facts in this particular case. From what I can see, the nurse called in to her supervisor that an incident occurred, and this is merely an incident report." The trial court also ordered defendant to "provide factual support" for its claim of privilege with respect to the claim form.

¶ 14    On September 6, 2018, defendant filed a motion indicating that it would not comply with the court's order requiring production of the adverse event report and requesting a friendly contempt finding to permit it to appeal the court's order. On the same day, defendant produced an additional affidavit from Quinones, in which Quinones averred that he completed the claim form on March 16, 2017, and completed the form "for purposes of transmitting the information

contained therein in confidence to Fresenius Medical Care North America's Corporate Health, Safety & Risk Management Department for the protection of the *** dialysis clinic." After completing the form, Quinones faxed the form to the corporate health, safety, and risk management department. Quinones further averred that, in his capacity as clinical manager of the dialysis clinic, "I am also aware that Notice of Potential Professional/General Liability Claim Forms, such as my March 16, 2017 Form, are shared by Fresenius Medical Care North America's Corporate Health, Safety & Risk Management Department with outside insurance where outside insurance is involved and has a duty to defend a potential professional/general liability claim." Finally, Quinones averred that these documents were intended to be confidential and were stored separately from patients' medical charts to ensure confidentiality.

¶ 15        On October 1, 2018, plaintiff filed an amended motion to compel, arguing that the claim form was not privileged under the insurer-insured privilege. As relevant to the instant appeal, plaintiff argued that Quinones was not within defendant's "control group," that defendant had not established that the insurer had a duty to defend the lawsuit, and that the claim form was transmitted to defendant's corporate health, safety, and risk management department, not to an insurer.

¶ 16        In response, defendant claimed that it had answered written discovery explicitly identifying that it was covered by insurance for plaintiff's fall under a liability policy issued by Continental Casualty Company, and that it had produced the policy declaration page for that insurance coverage. Defendant also claimed that the insurer had a duty to defend, as evidenced by the fact that it had retained counsel to represent defendant and had not filed a reservation of rights or a declaratory judgment lawsuit; defendant also submitted the entire insurance policy to the court for an *in camera* review. Finally, defendant claimed that Quinones transmitted the

7

document to the corporate health, safety, and risk management department with the expectation that it would be transmitted to the insurance company, so it qualified as a communication with the insurer.

¶ 17    On November 14, 2018, the trial court entered an order requiring defendant to produce the claim form. On December 12, 2018, defendant amended its motion for a finding of friendly contempt to add the trial court's ruling on the claim form. On December 13, 2018, the trial court entered an order finding defendant in friendly contempt for refusal to comply with its discovery orders in order to facilitate appeal and imposed a fine of $100. This appeal follows.

¶ 18                                    ANALYSIS

¶ 19    On appeal, defendant claims that the trial court erred in ordering production of both the adverse event report and the claim form. The instant appeal was filed pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), which permits an interlocutory appeal of "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty." Here, the trial court found defendant in friendly contempt of court and imposed a monetary penalty. Accordingly, we have jurisdiction to consider defendant's appeal. "Because discovery orders are not final orders, they are not ordinarily appealable." *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). "However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings." *Norskog*, 197 Ill. 2d at 69. "When [a party] appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order, the discovery order is subject to review. [Citation.] Review of the contempt finding necessarily requires review of the order upon which it is based. [Citation.]" *Norskog*, 197 Ill. 2d at 69. Thus, we turn to consideration of the two discovery orders at issue.

¶ 20                                    I. Adverse Event Report

¶ 21        We first consider the trial court's order requiring defendant to produce the adverse event

report, which defendant claims was privileged under the Medical Studies Act (Act). The legal

determination of whether the privilege set forth in the Act applies to dialysis centers is a

question of law that we review *de novo*. See *Eid v. Loyola University Medical Center*, 2017 IL

App (1st) 143967, ¶ 40. However, we review the trial court's factual determination that the

specific communication at issue was not part of a peer review study covered by the Act under

a manifest weight of the evidence standard. *Eid*, 2017 IL App (1st) 143967, ¶ 40. "The burden

of establishing the applicability of an evidentiary privilege rests with the party who seeks to

invoke it." *Eid*, 2017 IL App (1st) 143967, ¶ 40 (citing *Roach v. Springfield Clinic*, 157 Ill. 2d

29, 41 (1993)).

¶ 22        The Act provides, in relevant part:

            "All information, interviews, reports, statements, memoranda ***or other data of ***

            medical organizations under contract with health maintenance organizations or with

            insurance or other health care delivery entities or facilities, *** or committees of

            licensed or accredited hospitals or their medical staffs, including Patient Care Audit

            Committees, Medical Care Evaluation Committees, Utilization Review Committees,

            Credential Committees and Executive Committees, or their designees (but not the

            medical records pertaining to the patient), used in the course of internal quality control

            or of medical study for the purpose of reducing morbidity or mortality, or for improving

            patient care or increasing organ and tissue donation, shall be privileged, strictly

            confidential, and shall be used only for medical research, increasing organ and tissue

            donation, the evaluation and improvement of quality care, or granting, limiting or

revoking staff privileges or agreements for services ***." 735 ILCS 5/8-2101 (West 2016).

Thus, in order to be privileged under the Act, defendant must establish that the adverse event report was (1) a document of (2) an organization covered under the Act that (3) was used for one of the purposes specified in the Act.

¶ 23    As noted, we review *de novo* the question of whether the Act is applicable to a dialysis center such as the one operated by defendant. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). In the case at bar, defendant claims that it may be considered either a "licensed or accredited hospital[ ]" or a "medical organization[ ] under contract with health maintenance organizations or with insurance or other health care delivery entities or facilities" under the Act.

¶ 24    With respect to defendant's claim of being a hospital, defendant's support for this proposition comes entirely from dictionary definitions of hospitals. It is true that courts sometimes turn to the dictionary to aid in the interpretation of an otherwise-undefined statutory term. See, *e.g.*, *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369, 377 (2008). However, in this case, the Act specifically refers to "*licensed or accredited* hospitals." (Emphasis added.) 735 ILCS 5/8-2101 (West 2016). Accordingly, we find the definition of " '[h]ospital' " used in the Hospital Licensing Act (210 ILCS 85/3(A) (West 2016)) to be more instructive to our analysis. Defendant's dialysis center is certainly not considered a hospital under that statute, which defines a " '[h]ospital' " as "any institution *** devoted primarily to the maintenance and operation of facilities for the diagnosis and treatment or care of 2 or more unrelated persons admitted for overnight stay or longer in order to obtain medical, including obstetric, psychiatric

and nursing, care of illness, disease, injury, infirmity, or deformity." 210 ILCS 85/3(A) (West 2016). In its reply brief, defendant also points to the multitude of regulations applicable to the dialysis center in order to be covered under Medicare, and claims that "defendant is certainly accredited to provide its services." However, Medicare provides payment for both hospital-based and independent end-stage renal disease facilities. See, *e.g.*, 42 C.F.R. § 413.174 (discussing different rates applicable for each type of facility). The fact that defendant's dialysis center satisfies the requirements for coverage under Medicare does not mean that it is a "licensed or accredited hospital[ ]" for the purposes of the Act. Consequently, we find no basis to conclude that the center is a "licensed or accredited hospital[ ]."

¶ 25        Defendant also claims that it may be considered a "medical organization[ ] under contract with health maintenance organizations or with insurance or other health care delivery entities or facilities" under the Act. Defendant cites to two examples of such contracts. First, it claims that it has a contract with Southwest Nephrology Associates, S.C., for the provision of nephrology physician services to patients at the center. However, the citation provided by defendant in support of this claim is to an argument made by defendant in its briefing before the trial court; in that briefing, defendant stated that a copy of the contract could be provided to the trial court for its *in camera* review, but no copy of this contract appears in the record on appeal and it is unclear whether such *in camera* review was conducted. Second, defendant points to Quinones' deposition testimony, in which he testified that the center contracted with doctors and laboratories for testing. However, Quinones was not asked about, and did not provide, any names or details about such contracts.

¶ 26        Additionally, even accepting defendant's argument that defendant would be considered a "medical organization[ ] under contract with health maintenance organizations or with

11

insurance or other health care delivery entities or facilities" under the Act, defendant must still establish that the adverse event report was part of an internal quality-control process. As noted, whether specific materials are part of an internal quality-control process is a factual question on which defendant bears the burden of proving, and we will not reverse the trial court's factual determination unless it is against the manifest weight of the evidence. *Grosshuesch v. Edward Hospital*, 2017 IL App (2d) 160972, ¶ 14. "A decision is against the manifest weight of the evidence if it is unreasonable, arbitrary, or not based upon the evidence." *Grosshuesch*, 2017 IL App (2d) 160972, ¶ 14 (citing *Freese v. Buoy*, 217 Ill. App. 3d 234, 244 (1991)).

¶ 27    The purpose of the Act "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 40 (1993). The Act also serves "to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." *Niven v. Siqueira*, 109 Ill. 2d 357, 366 (1985). "The statute is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." *Roach*, 157 Ill. 2d at 40. "The Act was never intended to shield hospitals from potential liability [citation], and legal advice is not a goal of the protection offered by the Act [citation]." (Internal quotation marks omitted.) *Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.*, 347 Ill. App. 3d 817, 825 (2004).

¶ 28    However, not every piece of information a hospital staff acquires is shielded from discovery, even if it is acquired by a peer-review committee. *Frigo v. Silver Cross Hospital & Medical Center*, 377 Ill. App. 3d 43, 65 (2007). The privilege does not apply to all information used for internal quality control or peer review, but only to the " 'information of' " such

committees. *Nielson v. SwedishAmerican Hospital*, 2017 IL App (2d) 160743, ¶ 36 (quoting *Roach*, 157 Ill. 2d at 39); see also *Roach*, 157 Ill. 2d at 39 ("What the law actually protects is not information of a hospital's medical staff, but information of '*committees* of licensed or accredited hospitals or their medical staffs ***.' " (Emphasis in original.) (quoting 735 ILCS 5/8-2101 (West 1992))). " 'Information of' has a specific meaning here: it encompasses only information 'initiated, created, prepared or generated by' a peer-review or quality-control committee." *Kopolovic v. Shah*, 2012 IL App (2d) 110383, ¶ 19 (quoting *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 549 (2004)). Thus, documents generated specifically for the use of a peer-review committee receive protection under the Act, but the Act does not protect against disclosure of information generated before the peer-review process began. *Grosshuesch*, 2017 IL App (2d) 160972, ¶ 15. As our supreme court has explained:

"If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records. As a result, it would be substantially more difficult for patients to hold hospitals responsible for their wrongdoing through medical malpractice litigation. So protected, those institutions would have scant incentive for advancing the goal of improved patient care. The purpose of the [A]ct would be completely subverted." *Roach*, 157 Ill. 2d at 41-42.

¶ 29        In the case at bar, defendant claims that the adverse event report was an internal quality control document shielded under the Act because the nurse who prepared the report did so under the instruction of Quinones, a member of the QAI committee. We do not find this

13

argument persuasive. First, despite defendant's contention otherwise, there is no evidence that the report was prepared for the purpose of peer review or quality control. Defendant's policy on patient adverse event reporting indicates that all employees must immediately report any adverse events to the clinical manager, who will further report any serious adverse reports up the chain of command; the clinical manager is required to review all the facts surrounding an adverse event as soon as possible for review at the next QAI meeting. An accident where a plaintiff falls over a rug would be an adverse event, as a "[f]all" by a patient is listed as an "adverse event" under the policy. The employee most familiar with the event is also responsible for documenting the event in the patient's health record, and the clinical manager is responsible for completing any QAI materials. Thus, the adverse event reporting policy imposes a blanket policy requiring any adverse event to be reported, and such events are reviewed at the next QAI meeting. Our courts have found numerous times that an entity may not declare in advance that all incident documents are part of a peer-review process. See, *e.g.*, *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 406 (1998); *Lindsey v. Butterfield Health Care II, Inc.*, 2017 IL App (2d) 160042, ¶ 16; *Grosshuesch*, 2017 IL App (2d) 160972, ¶ 26.

¶ 30    Defendant argues that it does not have such a blanket policy declaring all adverse event reports to be protected. However, in addition to the requirements set forth by the policy above, defendant's argument is also contradicted by the express language of the policy: "QAI materials are *confidential* company records: QAI Adverse Event Report Logs/Plans, QAI Meeting Minutes, QAI Summaries and other related QAI materials are peer review and quality assurance materials that are protected." (Emphasis in original.) The policy's requirement that *all* adverse events be reported also contradicts defendant's argument that "a member of the

committee, Nurse Quinones, decided that the committee would review this occurrence and he initiated the process by designating Nurse Tamayo as the individual to conduct interviews and synthesize that information into the Adverse Event Report." Even if Quinones instructed the nurse to complete the actual adverse event report, this policy leaves no room for discretion as to whether an adverse event report will be reviewed by the QAI committee. This distinguishes the instant case from *Eid*, a case on which defendant relies. See *Eid*, 2017 IL App (1st) 143967, ¶ 18 (the chairperson of the committee would be contacted when an event occurred that could have potential for committee review and the chairperson would direct an investigation to begin upon a determination that investigation was warranted).

¶ 31    Additionally, even if *some* adverse event reports may be properly shielded under the Act, it does not follow that *this* adverse event report was part of an internal quality-control process such that it falls within the scope of the Act. "If *** a document was created in the ordinary course of the hospital's medical business, or for the purpose of rendering legal opinions, or to weigh potential liability risk, or for later corrective action by the hospital staff, it should not be privileged, even though it later was used by a committee in the peer-review process." *Chicago Trust Co.*, 298 Ill. App. 3d at 406; *Webb*, 347 Ill. App. 3d at 825. In the case at bar, we have reviewed the adverse event report *in camera* and agree with the trial court that the document was created in the ordinary course of business; it was not created for the purpose of rendering a legal opinion or to weigh potential liability risk or for later corrective action. It purports to show a brief description of an accident where a patient tripped on a rug. The report does not have anything to do with the quality of the health care provided by the center. Plaintiff's injury occurred when plaintiff fell after tripping on a rug in the center's entryway. Quinones admitted in his deposition that plaintiff had not had any interaction with any of defendant's employees

15

and that plaintiff had not received any medial treatment or care prior to his fall. Thus, plaintiff's fall would have no impact on "advancing the quality of health care" (*Roach*, 157 Ill. 2d at 40), the purpose of shielding peer-review or quality-control committee materials from disclosure. Plaintiff's fall had nothing to do with the quality of health care provided by the center, and plaintiff's complaint does not allege that it did. Consequently, we can find no reason why the report of this fall should be shielded by the Act.

¶ 32    We find instructive the case of *Dunkin v. Silver Cross Hospital*, 215 Ill. App. 3d 65 (1991), another case involving a fall. There, a visitor to the hospital filed suit after falling on a stairway at the hospital. *Dunkin*, 215 Ill. App. 3d at 66. The hospital sought to shield incident reports generated by hospital staff to document any unusual occurrences, which were "used in analyzing any problem areas and in determining the necessary steps to improve the quality of care and service." *Dunkin*, 215 Ill. App. 3d at 66. The hospital claimed that the reports were shielded by the Act "because they were used in the course of internal quality control and related to the improvement of hospital conditions." *Dunkin*, 215 Ill. App. 3d at 67. On appeal, the court found that the trial court had properly determined that the reports were not privileged, noting that the reports were not related to patient medical care. *Dunkin*, 215 Ill. App. 3d at 68. The court found:

> "The legislature's intent in enacting the statute was to protect with privilege those reports and studies on quality control and hospital conditions that relate to patient medical care. All of the cases cited by the parties on appeal involved materials that related to patient medical care. Here, the reports compiled by the hospital did not relate to such care in the same medical sense that the legislature was concerned about. The reports are the same kind of incident reports which any business might have.

Accordingly, we hold that the reports were discoverable and are admissible, assuming they meet other evidentiary tests." *Dunkin*, 215 Ill. App. 3d at 68.

¶ 33    As in *Dunkin*, the adverse event report with respect to plaintiff's fall was "the same kind of incident report[ ] which any business might have." *Dunkin*, 215 Ill. App. 3d at 68. It was not related to patient care—indeed, plaintiff was arriving at the center for treatment and had not received any treatment prior to his fall, nor had he even had any interaction with an employee. While defendant makes much of the fact that the plaintiff in *Dunkin* was a visitor, not a patient, that distinction is irrelevant here, because neither of the falls related to the individual's status as a patient. Defendant also claims that predialysis falls implicate a dialysis patient's ability to ambulate and the treatment and care he receives and therefore are related to patient care. However, defendant's argument stretches the Act far beyond its purpose. The fact that plaintiff's fall may impact his future treatment does not make the report of the fall itself an issue concerning the quality of the health care provided by the center. The adverse event report prepared in the instant case does not fall within the purview of the Act, and the trial court's determination that the report was discoverable was not against the manifest weight of the evidence.

¶ 34                                    II. Claim Form

¶ 35    We next consider the trial court's order requiring defendant to disclose the claim form submitted by Quinones to the corporate health, safety, and risk management department. Defendant claims that this document is shielded from discovery under the insurer-insured privilege. This court reviews a lower court's ruling concerning application of privileges in discovery *de novo*. *Sherman v. Ryan*, 392 Ill. App. 3d 712, 735 (2009). As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408

17

Ill. App. 3d at 578. "Because privileges protect rights outside of the discovery process and run counter to the general duty to disclose and the truth-seeking process, their application is strictly construed." *Sherman*, 392 Ill. App. 3d at 735 (citing *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 446 (2002)).

¶ 36    The insurer-insured privilege is related to the attorney-client privilege, and extends to communications between an insurer and insured, where the insurer has a duty to defend. *Chicago Trust Co.*, 298 Ill. App. 3d at 407. In order for the privilege to apply, a party must prove "(1) the identity of the insured; (2) the identity of the insurance carrier; (3) the duty to defend the lawsuit; and (4) that a communication was made between the insured and an agent of the insurer." *Rapps v. Keldermans*, 257 Ill. App. 3d 205, 212 (1993) (citing *Hyams v. Evanston Hospital*, 225 Ill. App. 3d 253, 257 (1992)).

¶ 37    In the case at bar, defendant claims that it established each element, while plaintiff claims that defendant did not prove any element. We have no need to discuss each element, because we find the final element dispositive. As noted, for a communication to be shielded under the insurer-insured privilege, a party must prove that the communication was made between the insured and an agent of the insurer. *Rapps*, 257 Ill. App. 3d at 212 (citing *Hyams*, 225 Ill. App. 3d at 257); see also *People v. Ryan*, 30 Ill. 2d 456, 461 (1964). In the case at bar, the claim form was transmitted from Quinones to the corporate health, safety, and risk management department. Quinones also averred that, in his capacity as clinical manager, "I am also aware that Notice of Potential Professional/General Liability Claim Forms, such as my March 16, 2017 Form, are shared by Fresenius Medical Care North America's Corporate Health, Safety & Risk Management Department with outside insurance where outside insurance is involved and has a duty to defend a professional/general liability claim." Defendant claims that it was

18

clear that the claim form was then sent to the insurer by the fact that defense counsel was appointed to represent defendant in the instant case. We do not find this argument persuasive.

¶ 38     There is no dispute that Quinones sent the claim form to the corporate health, safety, and risk management department. However, defendant fails to connect the dots between the corporate health, safety, and risk management department and the insurer. There is no evidence that the claim form was sent from the corporate office to the insurer. The claim form itself, which we have reviewed *in camera*, does not contain any reference to the insurer—it is defendant's own form, with defendant's logo in the corner and containing references only to defendant's corporate office. In other words, it is not a claim form issued by the insurance company, nor is there any evidence that the insurance company approved the form of the document. There is also no affidavit from any member of the corporate health, safety, and risk management department suggesting that this form was transmitted to the insurance company. At best, Quinones' affidavit suggests that, as a general matter, these types of forms were forwarded to the insurance company where applicable. We also find unpersuasive defendant's suggestion that transmission of the communication was implied by the fact that the insurance company retained counsel for the defense of the instant matter. However, all that this proves is that the insurer was aware of the incident and of the lawsuit—there is no indication that *this claim form* was sent to the insurer, which is the relevant inquiry. Absent any evidence that this claim form was actually sent to the insurance company, we cannot find that the claim form is shielded from discovery based on the insurer-insured privilege and, accordingly, affirm the trial court's order requiring the production of the form.

¶ 39     In addition, even if there was proof that the form was sent to the insurance company as a claim form, there is nothing in the form that even describes how the fall occurred. The form

describes the "Description of Incident" as "patient found lying on the rug at the front foyer." There is no description of injury or any other information other than the date and time of the incident and the names and phone numbers of two witnesses. There is nothing that would be privileged in this document.

¶ 40                                III. Contempt Finding

¶ 41        Despite our conclusion as to the production of the documents, we nevertheless vacate the trial court's contempt finding. It is appropriate for a party to request that a contempt order be entered against it so that party may seek immediate appeal of a trial court's discovery order. *Webb*, 347 Ill. App. 3d at 828. "In such situations, where the party sought the order in good faith and was not contemptuous of the trial court's authority, we may vacate the contempt order even when we find that the trial court's discovery order was proper." *Webb*, 347 Ill. App. 3d at 828 (citing *Berry v. West Suburban Hospital Medical Center*, 338 Ill. App. 3d 49, 57 (2003)). In the case at bar, defendant appropriately sought review of discovery orders requiring the production of documents it believed were privileged. Accordingly, we vacate the contempt order entered against defendant.

¶ 42                                     CONCLUSION

¶ 43        For the reasons set forth below, we affirm both of the trial court's orders requiring production of the adverse event report and the claim form. First, the adverse event report did not fall within the scope of the Medical Studies Act. Additionally, defendant failed to establish all of the required elements for the insurer-insured privilege. However, despite our findings as to the trial court's discovery order, we nevertheless vacate the trial court's contempt finding.

¶ 44        Affirmed; contempt finding vacated.